Judge Robert J. Bryan

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JAY MICHAUD, <br><br> Defendant. | NO. CR15-5351RJB <br><br> UNITED STATES' RESPONSE TO ORDER COMPELLING DISCOVERY |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, Matthew P. Hampton, Assistant United States Attorney for said District, and Keith A. Becker, Trial Attorney, hereby files this response to the Court's December 15, 2015, order compelling discovery (Dkt. 81):

**A.   Number of pictures, videos, and links**

The Court first ordered the government to provide the defense with the number of child pornography pictures, videos, and links to pictures and videos that were posted on Website A between February 20 and March 4, 2015, "[p]rovided however, if the plaintiff cannot produce the exact picture, video and link totals listed above with reasonable effort, the plaintiff should provide a good faith estimate of the totals."  Dkt. 81, pp. 1-3.

Website A was an online bulletin board through which users provided the content of the site by posting messages and/or replies to messages within categories set up by the site

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

administration. In accordance with the site rules and guidelines, users generally posted textual messages in which "preview" images (generally consisting of still frames taken from a video or a selection of images) were embedded, and that included a link to a URL, the address of a website or server at which the videos or images could be downloaded, along with any password necessary to download and decrypt the videos or images.

During the course of the investigation of Website A, before and after its seizure, the FBI expended significant efforts to document and capture as many of the images/videos posted in this fashion by site users as practicable. Given the significant number of users and activity on the website, it was not possible to capture all of that content. To access the images and videos, the agents had to access the website or link contained in the message, download the files or a file "archive" – that is, a compressed file containing numerous other files – and then enter a password in order to access the files. This process could not be automated, meaning that it was necessary for an agent physically to take these steps rather than simply direct a computer to do the work. Moreover, images and videos that were made available by Website A users were generally only available for a limited time. Thus, if the agents were not able to complete accessing all of the website's advertised materials at or near the time of posting, those materials might no longer be available. With that understanding, we provide the following good faith estimates based upon FBI agents' downloads of files made available by the users of Website A through their posts and through the seizure of data from the Website A image and file hosts.

Through the efforts described above, the FBI recovered approximately 48,000 images and 200 videos that were made available by the site's at least 184,000 users between the inception of Website A in August 2014 and its seizure on February 20, 2015. In addition, the FBI was able to recover approximately 9,000 images and 200 videos that were made available by Website A users while it operated under FBI administrative control between February 20 and March 4, 2015. The vast majority of those images/videos appeared to depict child pornography or child erotica. In some instances, particularly with respect to sets of images pertaining to a particular child, children were depicted in various states of undress progressing to nudity and/or sexually explicit activity. This is common among child pornography images.

Website A users posted approximately 110,000 links on the website between August 2014 and February 20, 2015. During the period from February 20 through March 4, 2015,

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Website A users posted approximately 13,000 links on the website. As noted above, links posted by Website A users typically pointed either to encrypted archives containing multiple image or video files of child pornography, or to particular image files depicting child pornography. Although FBI cannot specify exactly how many images and videos were contained within each of those encrypted archives, as noted above, FBI was able to recover approximately 9,000 images and 200 videos that were made available by Website A users while it operated under FBI administrative control between February 20 and March 4, 2015.

### B. Views and downloads from February 20 through March 4, 2015

The Court next ordered the government to provide the defense with the number of child pornography pictures and videos that were viewed and downloaded from Website A between February 20 and March 4, 2015, or a good faith estimate of these totals. Because of the manner in which Website A works, it is not possible to give an exact total of child pornography images or videos viewed or downloaded by site users during that time period. As noted above, Website A was a bulletin board on which users posted messages with embedded links and preview images. Another user may choose simply to view the preview image that is embedded on a web page without clicking that image or taking an action that would be recorded by Website A. Moreover, there are numerous ways for a user to save or download images contained on a website such as Website A that would not be recorded by the website. For example, a user might "right click" and save an image to the user's computer. The user could also take a "screen shot" of the computer screen, or go directly to the external website where linked images or videos were contained by typing the URL for the site after leaving Website A, and then entering the appropriate password, and downloading the images/videos. With that understanding, we provide the following good faith estimates.

Information about the number of links Website A users clicked on between August 2014 and February 20, 2015, before the FBI was in administrative control of the website, is not available. Between February 20 and March 4, 2015, Website A users clicked on approximately 67,000 unique links on the website. As explained above, links on Website A typically pointed either to encrypted archives containing multiple image or video files of child pornography, or to particular image files depicting child pornography. Of those 67,000 links, 25,000 were links to

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

image files, the majority of which appeared to depict child pornography. The remaining links were to websites, which typically contained the sort of encrypted archives described above.

### C. Statistics concerning Website A usage between February 20 and March 4, 2015

The Court next ordered the government to provide the defense with the number of visitors to the site between February 20 and March 4, 2015, the number of total visits, and some measure of the length of visits. Between February 20 and March 4, 2015, approximately 100,000 unique user accounts logged in to Website A, and there were approximately one million total logins. An individual could have more than one user account on the site, so it is not clear how many individuals this actually represents. Website A tracked total time spent on the site by each user during the course of the user's membership. From the inception of the website in August of 2014 until March 4, 2015, site data indicate that its more than 200,000 users aggregately spent approximately seven million hours logged into the site. Based on available data and with reasonable effort, the government cannot provide an estimate of the total or average length of site visits between February 20 and March 4, 2015. Providing such figures would require a manual review of every single session by every single site user in order to total the amount of time spent during each session, and then average that amount of time. That manual analysis has been done for Mr. Michaud (via data that have been provided to the defense in discovery pertaining to his use of Website A) and shows that during his fourteen total sessions on Website A between February 21, 2015, and March 2, 2015, Michaud spent approximately sixteen-and-a-half hours on Website A for an average of 1.18 hours per visit. As previously disclosed, Michaud spent a total of approximately ninety-nine hours logged into the site between October 31, 2014, and March 2, 2015.

### D. Mitigation efforts

The Court next ordered the government to provide the defense with a summary of any measures that were taken by the FBI or other law enforcement entities to block access to the pictures, videos and links available on or through the Website A between February 20 and March 4, 2015.

During the brief period when the FBI assumed administrative control of Website A, the FBI did not post any images, videos, or links to images or videos of child pornography. Images,

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

videos and links posted by site users both before the FBI assumed administrative control and afterwards, generally remained available to site users.

While Website A operated under FBI administrative control, FBI Special Agents monitored all site postings, chat messages, and private messages twenty-four hours per day in order to comply with Title III monitoring requirements and in order to assess and mitigate any risk of imminent harm to children. In the event that FBI Special Agents perceived a risk of imminent harm to a child, agents took actions to mitigate that risk and immediately forwarded available identifying information, including NIT results, to the appropriate FBI office. Specific actions taken in any particular instance were tailored to the specific threat of harm. The particular actions taken by law enforcement agents in response to particular circumstances are protected by a qualified law enforcement privilege, which the United States hereby asserts. In particular, disclosure of this information at this point in time would alert subjects of ongoing investigations to the particular investigative techniques used by law enforcement in response to such circumstances, creating a risk that criminal suspects will recognize and circumvent such techniques in the future and leading to increased danger of harm to the public, including children. The risk of circumvention of an investigative technique if information is released has been recognized as a factor in applying law enforcement privilege to electronic surveillance. *See United States v. Van Horn*, 789 F.2d 1492, 1508 (11th Cir. 1986). In any event, no such actions pertained to any postings or messages involving the defendant's known username, Pewter.

### E. Reason for shutting down Website A

The Court also required the government to produce the reasons the site was shut down on March 4 (rather than earlier or later). As the government explained to the two separate judges who authorized the NIT and the Title III authorization to monitor site users' communications, the fourteen-day period during which the FBI allowed the operation of Website A to continue was necessary in order to deploy the court-authorized NIT to identify users of this site who, like Mr. Michaud, used Tor to conceal their identity, location, and illegal conduct. Without using the NIT, the identities of the users of Website A would remain unknown because, unlike a non-Tor website, any IP address logs of user activity on Website A would disclose only Tor "exit nodes," which could not be used to locate and identify the actual administrators or users of the site. Further, because of the unique nature of the Tor network and the method by which the network

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

routes communications through multiple other computers, investigative procedures that are usually employed in criminal investigations of this type were tried and failed or reasonably appeared to be unlikely to succeed.

The government demonstrated the necessity of the investigative strategy and technique used in this investigation in the affidavit submitted in conjunction with its Title III authorization. As the government indicated in that affidavit, agents considered seizing Website A and removing it from existence immediately and permanently. In the judgment of law enforcement agents, while doing so would have ended the trafficking of child pornography taking place via Website A, it would have also prevented law enforcement from attempting to locate and identify its users, who were the ones who possessed, and were distributing and receiving, those illicit materials. It also would have frustrated agents' attempts to obtain information that could help identify and rescue child victims from ongoing abuse. Accordingly, it was the judgment of law enforcement that the seizure and continued operation of Website A, for a limited period of time, paired with the court-authorized deployment of a NIT and monitoring of user communications, was necessary and appropriate in order to identify Website A users. The judges who signed the NIT warrant and Title III authorization obviously agreed.

To be sure, shutting down a facility such as Website A would have prevented its unidentified users from continuing to post and disseminate child pornography through that website, but it would not prevent those users from continuing to unlawfully possess and disseminate child pornography by other means. Website A users engaged in that sort of activity before the FBI seized and shut down Website A, and those users who were not identified and apprehended undoubtedly continued to engage in that activity after Website A was shut down, often through other online facilities. For instance, before the February 20, 2015, seizure of Website A, it contained at least 184,000 active user accounts, 103,000 posts, and facilitated access to thousands of images and videos of child pornography. There are currently child pornography bulletin boards operating on the Tor network that are similar in structure and function to Website A, that contain hundreds of thousands of user accounts, tens of thousands of postings, and which facilitate access to thousands of images and videos of child pornography. Law enforcement agents can view and document those websites, their contents, and the child pornography images and videos trafficked through them – but because they operate as Tor

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

hidden services, the location of the computer servers hosting the websites, and the location and identity of their users who are perpetrating crimes against children, and their child victims, are currently unknown.

Stopping the unlawful possession and dissemination of child pornography materials by particular individuals, and rescuing children from the ongoing abuse and exploitation of individual perpetrators, therefore requires more than just shutting down one facility through which such materials are disseminated. Law enforcement must identify and apprehend the perpetrators. Here, the FBI briefly assumed administrative control over an existing facility through which users were already posting and accessing child pornography, for a limited period of time, in order to deploy a court-authorized investigative technique and engage in court-authorized monitoring of user communications, which were necessitated by the particular anonymizing technology deployed by the users of the site, in an effort to identify those perpetrators. This difficult decision, which was disclosed both to the magistrate who approved the NIT and the district judge who approved the Title III monitoring, was amply justified by the particular facts of the investigation.

During the government's operation of Website A, regular meetings were held to discuss the status of the investigation and identification of site users and assess whether the site should continue to operate, based upon a balancing of various factors, to include site users' continued access to child pornography, the risk of imminent harm to a child, the need to identify and apprehend perpetrators of those harms to children, and other factors such as those described above. On March 4, 2015, it was determined that the balance of those factors weighed in favor of shutting down the website.

### F. Statistics concerning charges

Although it is not reflected in the Court's written order, during the December 11, 2015, hearing the court also stated: "[i]f specifics are not available, I think also the number of charges arising from this investigation should be – the numbers, only numbers, I am saying – should be provided to the defense." Dec. 11, 2015, Tr. at 34. The investigation into users of Website A remains ongoing. To date, at least 137 individuals in the United States are known to have been charged in connection with the underlying investigation of Website A. That includes thirty-five individuals who have been determined to be "hands on" child sexual offenders, and seventeen

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

individuals who have been determined to be producers of child pornography. More importantly, twenty-six child victims have been identified or recovered from abuse. Individual charging decisions are made at the discretion of United States Attorneys' Offices and/or appropriate state authorities and this does not represent a complete reporting of all individuals who could be charged in connection with the investigation.

### G.  Documents regarding FBI administrative control of Website A

Although the Court also ordered the government to provide: "All documents relating to review and authorization of the FBI's administrative control of the site by the Department of Justice or other governmental agencies that were involved in the 'Website A' investigation and deployment of the NIT at issue in our case," the Court qualified its directive, stating: "Provided further, that the government need not provide to defense counsel any documents under the above requirement that constitute reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting this case[.] FRCP 16(a)(2)." Dkt. 81 at pp. 2-3.

Discovery materials already provided, including the NIT search warrant and the Title III application paperwork, clearly indicate the scope and purpose of the operation to identify users who were abusing and exploiting children online while masking their location via the Tor network. The NIT search warrant affidavit, which clearly described the operation of the website at a government facility for a limited time in order to identify users, was sworn to by an FBI Special Agent and presented by an Assistant U.S. Attorney from the Eastern District of Virginia and a Trial Attorney with the Department of Justice's Child Exploitation and Obscenity Section. The Title III application and affidavit, which also clearly described the scope and purpose of the operation, including the website's operation at a government facility for a limited period of time in order to deploy a court-authorized NIT to identify users, was submitted by two Department of Justice attorneys, based on an affidavit sworn to by an FBI Special Agent, and approved, as all Title III applications are required to be, by a Deputy Assistant Attorney General of the Department of Justice's Criminal Division.

Although the United States is in possession of documents that would be responsive to the first portion of the Court's order, the United States is not producing those documents at this time pursuant to the second portion of the Court's order, Federal Rule of Criminal Procedure 16(a)(2),

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

attorney-client, work product and deliberative process privileges. *See United States v. Fernandez*, 231 F.3d 1240, 1246-47 (9th Cir. 2000).

DATED this 8th day of January, 2015.

Respectfully submitted,

| | |
|---|---|
| ANNETTE L. HAYES<br>United States Attorney | STEVEN J. GROCKI<br>Chief |
| */s/ Matthew P. Hampton*<br>Matthew P. Hampton<br>Assistant United States Attorney<br>1201 Pacific Avenue, Suite 700<br>Tacoma, Washington 98402<br>Telephone: (253) 428-3800<br>Fax: (253) 428-3826<br>E-mail: matthew.hampton@usdoj.gov | */s/ Keith A. Becker*<br>Trial Attorney<br>Child Exploitation and Obscenity Section<br>1400 New York Ave., NW, Sixth Floor<br>Washington, DC 20530<br>Phone: (202) 305-4104<br>Fax: (202) 514-1793<br>E-mail: keith.becker@usdoj.gov |

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

    */s/ Matthew P. Hampton*
MATTHEW P. HAMPTON
Assistant United States Attorney

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800