```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Newport News Division

 3   - - - - - - - - - - - - - - - - - -
        UNITED STATES OF AMERICA,           )
 4                                          )
                Plaintiff,                   )
 5                                          )      CRIMINAL CASE NO.
        v.                                   )        4:16cr00016
 6                                          )
        EDWARD JOSEPH MATISH, III,           )
 7                                          )
                Defendant.                   )
 8   - - - - - - - - - - - - - - - - - -

 9

10                       TRANSCRIPT OF PROCEEDINGS

11
                              Norfolk, Virginia
12                             June 14, 2016

13

14

15   BEFORE:   THE HONORABLE HENRY COKE MORGAN, JR.
                United States District Judge
16

17

18   APPEARANCES:

19            UNITED STATES ATTORNEY'S OFFICE
              By:  Kaitlin C. Gratton
20                 Jay V. Prabhu
                   Assistant United States Attorneys
21                 Counsel for the United States

22            FEDERAL PUBLIC DEFENDER'S OFFICE
              By:  Andrew W. Grindrod
23                 Assistant Federal Public Defender
                   Counsel for the Defendant
24

25
```

```
1                        I N D E X

2

3  ON BEHALF OF THE DEFENDANT:      Direct   Cross   Red.   Rec.

4  D. Alfin                           4       21      32     --

5

6

7

8

9                      E X H I B I T S

10  No.                                                     Page

11   (None)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (The proceedings commenced at 12:04 p.m. as
 2   follows:)
 3              THE CLERK:  Criminal Case No. 4:16cr16, the United
 4   States of America v. Edward Joseph Matish, III.
 5              Ms. Gratton, Mr. Prabhu, are you ready to proceed
 6   for the government?
 7              MS. GRATTON:  The government is ready to proceed.
 8              Good afternoon, Your Honor.
 9              THE COURT:  Good afternoon.
10              THE CLERK:  Mr. Grindrod, is your client ready to
11   proceed?
12              MR. GRINDROD:  Mr. Matish is ready to proceed.
13              Good afternoon, Your Honor.
14              THE COURT:  All right.  We're here on the
15   defendant's discovery motion.  Does either side have any
16   evidence to present, or just argument?
17              MS. GRATTON:  The government is prepared to present
18   brief testimony from Agent Alfin in response to the most
19   recently filed declaration, if the Court would find it
20   helpful.
21              THE COURT:  Do you have any evidence?
22              MR. GRINDROD:  Not that hasn't been already
23   submitted, Your Honor.
24              THE COURT:  By that you mean the declaration?
25              MR. GRINDROD:  That's correct, Your Honor.
```

─────────────── D. Alfin - Direct ───────────────

```
 1            THE COURT:  Okay.  Well, do you have any evidence?
 2            MS. GRATTON:  If the Court would permit, we would
 3   briefly call Agent Alfin to the stand.
 4            THE COURT:  All right.
 5            (The clerk administered the oath.)
 6            DANIEL ALFIN, called as a witness, having been first
 7   duly sworn, testified as follows:
 8                         DIRECT EXAMINATION
 9   BY MS. GRATTON:
10   Q.  Good afternoon.  Can you please introduce yourself to the
11   Court?
12   A.  My name is Daniel Alfin.  I am a Special Agent with the
13   FBI.  I am currently assigned to FBI Headquarters, Criminal
14   Investigative Division, Violent Crimes Against Children
15   Section, Major Case Coordination Unit, located in Lithicum,
16   Maryland.
17   Q.  And you're familiar with the case involving Edward
18   Matish, III?
19   A.  I am.
20   Q.  And you've testified previously with respect to the
21   motions to suppress the NIT warrant.
22   A.  I have.
23   Q.  You also submitted a witness declaration in response to
24   the motion to compel discovery for which we are here today.
25   A.  That's correct, I've submitted a declaration.
```

—————— D. Alfin - Direct ——————

1  Q.  Have you reviewed the other declaration submitted by the

2  defendant in support of his motion to compel?

3  A.  I have.

4  Q.  Including, most recently, the declaration submitted of

5  Dr. Christopher Soghoian?

6  A.  Yes, I have.

7        THE COURT:  Dr. who, now?  Oh, the most recent one?

8        MS. GRATTON:  The most recent declaration.

9        THE COURT:  Right.

10  BY MS. GRATTON:

11  Q.  Before we move into that, can you briefly remind the

12  Court -- the Court is obviously familiar with the network

13  investigative technique, but the nature of the information

14  collected by the operation of that technique in this case?

15  A.  The information collected by the network investigative

16  technique was a limited set of information originating from

17  the computer of Mr. Matish.  That information was authorized

18  by a search warrant in the Eastern District of Virginia.  The

19  information that was collected was within the scope of that

20  search warrant.

21        Additionally, all the information that was collected

22  has been provided to defense for review or has been made

23  available to defense for review.

24  Q.  And that includes the MAC address?

25  A.  Correct, it included the MAC address of the computer, the

D. Alfin - Direct

1    operating system version --

2            THE COURT:  The what kind of address?

3            THE WITNESS:  Your Honor, in order to connect to the

4    Internet or any network, a computer has a network card in it.

5    It could be a wireless network card, or it could be a

6    hard-wired network card that you plug a cable into.  All of

7    these network cards, regardless of the type, have a MAC

8    address.

9            THE COURT:  A MAC address?

10           THE WITNESS:  Yes, Your Honor.  MAC is an acronym

11   that stands for media address control.

12           THE COURT:  Is that different than IP address?

13           THE WITNESS:  Yes, Your Honor.  A MAC address is

14   unique and does not change.  So you can look at the MAC

15   address in the matter at hand from Mr. Matish's computer, and

16   that MAC address is always the same.  It is the one that was

17   identified by the government.  It was also the one that was

18   seized by the government.  A MAC address is hard-wired or

19   burned into the card.

20           THE COURT:  And the MAC address was among the

21   information seized, in addition to the IP address?

22           THE WITNESS:  Yes, Your Honor, also listed in the

23   warrant attachment.

24           THE COURT:  Okay.

25   BY MS. GRATTON:

D. Alfin - Direct

1  Q.  And also the operating system?

2  A.  Correct, the version of the operating system that was

3  active on the computer, the name of the computer itself, and

4  the user name that was currently logged in to the computer.

5  Q.  And all of those items were listed in Attachment B of the

6  search warrant?

7  A.  Yes, in one of the attachments to the search warrant.

8  Q.  Is there other information related to the user account on

9  the Playpen Web site?  As part of the investigation, was that

10  information maintained?

11  A.  Yes, during the course of the investigation the FBI

12  monitored the activity on the Playpen Web site and captured

13  the activity associated with each individual user on the

14  Playpen Web site.  In the matter at hand that involved

15  information pertaining to the user account on the Playpen Web

16  site named Broden.  That information was collected by the

17  government as it was monitoring the Web site.  It was not

18  collected as a function of the NIT.

19  Q.  Are you familiar with the information --

20         THE COURT:  Now, wait a minute.  The information

21  about the Broden account was obtained from the Web site --

22  what Web site?

23         THE WITNESS:  Your Honor, the FBI, for a limited

24  period of time, operated the Playpen Web site.

25         THE COURT:  Right.

──────── D. Alfin - Direct ────────

1           THE WITNESS:  Which is the Web site the defendant is

2   accused of accessing.  While we were operating the Web site

3   we were also monitoring and recording every action that every

4   user took on the Web site, so we were able to see for the

5   matter at hand -- for the Broden account we can see every

6   time the Broden account logged in, we can see where they went

7   on the Web site, we can see what posts they accessed on the

8   Web site, and we have a report that we've made available to

9   defense so they can see every individual action, broken down

10  by date and time, that the Broden user took on the Web site.

11          THE COURT:  But you didn't know who the Broden

12  account was at that time.  Is that right?

13          THE WITNESS:  Correct, Your Honor.  That information

14  was collected independent of the NIT.

15          THE COURT:  Before the NIT was --

16          THE WITNESS:  Both before, during, and after.

17          THE COURT:  Well, but you had -- you were able to

18  see the activity of the Broden account without having to

19  activate the NIT.

20          THE WITNESS:  That is correct.

21          THE COURT:  How did you do that?

22          THE WITNESS:  Because we had control of the Web

23  site, we could see where all the users were going on the Web

24  site.  Even without being able to fully identify them, we

25  could still see what the Broden --

──────── D. Alfin - Direct ────────

1          THE COURT:  So in order to find out who Broden was

2    you had to employ the NIT.  Is that correct?

3          THE WITNESS:  That's correct, Your Honor.

4          THE COURT:  Which you did.

5          THE WITNESS:  That's correct, Your Honor.

6          THE COURT:  Okay.

7    BY MS. GRATTON:

8    Q.  Are you familiar with the information that has been

9    disclosed in discovery or made available in this case?

10   A.  I am.

11   Q.  Can you briefly summarize that for the Court?

12   A.  Several pieces of evidence have either been turned over

13   to defense or made available for defense to review.  One of

14   those pieces of evidence is the activity that we monitored

15   and collected on the Web site.  That's the activity that

16   shows when the Broden user account logged in to the Web site,

17   where the Broden user account went to on the Web site, every

18   post that the Broden user account accessed while the FBI was

19   monitoring the Web site.

20          In addition to that, we also have turned over to

21   defense the source code for the NIT, for the network

22   investigative technique, that collected the limited amount of

23   information from Mr. Matish's computer.  That source code has

24   been turned over to the defense for review.  The important

25   thing about that source code is that it can be observed,

Heidi L. Jeffreys, Official Court Reporter

D. Alfin - Direct

1   analyzed, and it can be executed to confirm that it collects

2   exactly what the FBI says it collects.  And, additionally, it

3   can be executed and viewed to confirm that the information

4   that the FBI collected and made available in discovery did,

5   in fact, originate from Mr. Matish's computer.

6   Q.  And what would that process involve?

7   A.  What we turned over is the source code for the NIT.  And,

8   so, Mr. Matish or a defense expert would take that code and

9   compile it, which means just turning it into a program that

10  you can run on a computer.

11           And, so, if I were the defense expert, if I was

12  going to verify the address of the NIT, I would take that

13  source code, I would compile it, and because Mr. Matish's

14  computer is available for defense to review, they can

15  actually execute the NIT on a copy of Mr. Matish's computer

16  and confirm that it does exactly what the FBI says it does,

17  no more than what the FBI says it does, and that the

18  information that it collects is what was turned over in

19  discovery and is true and accurate.  They have everything

20  that they need in order to complete that process.

21  Q.  Was there additional information related to the

22  transmission of data from the NIT to the government when it

23  was executed in this case that's been made available?

24  A.  Yes.  When the NIT was executed and ran the instructions

25  that it was authorized to run on Mr. Matish's computer, it

———————— D. Alfin - Direct ————————

1   transmitted items of evidence to the government.  Those items

2   are what is listed in the attachments to the NIT search

3   warrant, and that data stream was collected and preserved in

4   its entirety.  It can be reviewed.  I have reviewed it

5   myself.  I have confirmed that the information in that data

6   stream matches exactly what has been turned over to defense.

7   It matches exactly what the FBI was authorized to collect.

8           Importantly, it can be reviewed.  It can be used in

9   conjunction with the source code that we've turned over to

10  verify that what the NIT generates is the same as what the

11  FBI has collected and turned over.

12  Q.  And that was something that you provided this morning and

13  are aware has been turned over to defense counsel?

14  A.  Correct, it was provided on a disk today.

15          THE COURT:  When?

16          THE WITNESS:  Just before the hearing, Your Honor.

17          THE COURT:  What hearing?

18          THE WITNESS:  This hearing, Your Honor.

19          THE COURT:  I thought you had already done that.

20  You just did it today?

21          THE WITNESS:  We turned over the source code for the

22  NIT previously, Your Honor.  What we turned over today is the

23  copy of the network data that went from Mr. Matish's computer

24  to the government.  It reflects the same information --

25          THE COURT:  In response to the NIT?

———— D. Alfin - Direct ————

1        THE WITNESS:  Yes, Your Honor.

2        THE COURT:  All right.

3    BY MS. GRATTON:

4    Q.  And you've testified that computers have been made

5    available.  Are you familiar with any reports generated based

6    on the analysis of those computers at various times in this

7    investigation?

8    A.  Yes, I read reports from a preview of Mr. Matish's

9    computer.  That preview confirmed that the computer on which

10   the NIT was executed is, in fact, Mr. Matish's computer.  The

11   information in that report matches what the FBI collected, it

12   matches what the FBI turned over, and it matches what defense

13   is able to duplicate with the discovery that they've been

14   provided.

15   Q.  And when was that preview conducted?

16   A.  That preview, I was informed, was conducted pursuant to

17   the search warrant that was executed at Mr. Matish's

18   residence.

19   Q.  And of the information that you described, can you

20   briefly explain for the Court how it could be used to

21   determine the full extent of what information was seized

22   through the operation of the NIT?

23   A.  The NIT source code that was turned over can be executed

24   by defense.  They can see exactly what information it

25   collects, what it generates, and they can compare that to

———— D. Alfin - Direct ————

1   what has been turned over to the government.  If they were to

2   execute it on Mr. Matish's computer, they would observe that

3   the information that is collected is, in fact, what the FBI

4   collected pursuant to the NIT search warrant.

5   Q.  Would that process also reveal whether any additional

6   information, such as images or other content, were

7   transmitted as part of the NIT?

8   A.  It would.  If you were to execute the NIT, compile the

9   source code, and run it on the computer, you would be able to

10  observe if any images or other files were being pulled from

11  somewhere else on the Internet.  That is not a function of

12  the NIT, but the discovery that we provided can confirm that.

13          Additionally, because we provided the full and not

14  redacted data stream as a result of the execution of the NIT,

15  that data stream can be reviewed, and it can confirm that

16  there were no images transmitted, or videos, or any other

17  files as a result of the NIT.

18          I have reviewed the data stream myself and confirmed

19  that no files of any sort were transferred to Mr. Matish's

20  computer as a result of the NIT.

21  Q.  How could the information provided or made available to

22  the defendant be used to determine whether the NIT interfered

23  with or compromised any data or computer functions?

24  A.  In declarations that have been submitted on behalf of

25  Mr. Matish there are allegations that the NIT could have

—————— D. Alfin - Direct ——————

1    installed software or could have made changes to the

2    computer.  The NIT did not install software, it did not make

3    changes to the computer; however, defense has everything that

4    they need to verify these claims.  They have the NIT itself

5    that they can review to confirm that it does not make changes

6    to the computer.  They also have access to Mr. Matish's

7    computer.  They can review it, they can analyze it, and they

8    can see if there's anything on the computer, any settings

9    that were changed or anything else as a result of the NIT.

10          Again, the NIT did not do anything outside of the

11   scope of what the NIT warrant authorized; however, Mr. Matish

12   has all the information that he needs available to him to

13   confirm or dispute those claims.

14   Q.  And what about determining the accuracy of the

15   information that the NIT generated?

16   A.  In one of the declarations that was submitted on behalf

17   of Mr. Matish by Dr. Soghoian, it is alleged that because the

18   NIT sent data over the regular Internet and not encrypted

19   that the authenticity of the data could not be verified.

20   This is incorrect.

21          It also fails to acknowledge that the NIT was, in

22   fact, sent to Mr. Matish's computer over the Tor network,

23   which is encrypted.

24          It also included with it a unique identifier.  And,

25   so, because that unique identifier was sent to Mr. Matish's

──────────── D. Alfin - Direct ────────────

1    computer over an encrypted connection, we know that it was

2    not tampered with at that point in time.  Additionally, the

3    transmission that was received from the government contained

4    that same unique identifier, so the government was able to

5    confirm when it received the information generated by the NIT

6    that it had not been tampered with.

7             Additionally, in order for an individual to have

8    successfully tampered with the NIT data stream, that

9    individual would have had to have known about the FBI's

10   operation, known the IP address that the FBI was utilizing.

11   They also would have had to have physical access or some

12   other kind of access to Mr. Matish's computer to learn the

13   MAC address and other information from his computer.  They

14   would have had to have known that Mr. Matish was a member of

15   the Playpen Web site, they would have had to have known when

16   Mr. Matish was going to access the Playpen Web site, and they

17   would have had to have a capability to intercept the FBI data

18   stream and alter it in the course of about a second, because

19   that's how long the NIT data stream took to transfer.

20            No such individual or organization exists who could

21   have known those things and would have had the capability to

22   alter the data in that manner.

23   Q.  On that point, for example, when did the FBI's operation

24   become public?

25   A.  FBI's operation was conducted approximately between

D. Alfin - Direct

 1  February 20, 2015, and March 4, 2015.  The first public

 2  reporting on the operation, I believe, was approximately June

 3  of that year, several months after the FBI's operation had

 4  concluded, and there is no information or evidence to suggest

 5  that anyone knew about the FBI's operation while it was

 6  ongoing.

 7          THE COURT:  Did you say from February 20th to

 8  March 4th?

 9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Of '15?

11          THE WITNESS:  Yes, Your Honor.

12  BY MS. GRATTON:

13  Q.  Would encryption of the data as it was transmitted from

14  the computer to the government -- what effect, if any, would

15  that have had on the utility of the data going forward?

16  A.  It would have not completely made the network data

17  useless, but it would have hurt it from an evidentiary

18  standpoint.

19          Because the FBI collected the data in a clear text,

20  unencrypted format, it shows the communication directly from

21  Mr. Matish's computer to the government.  It can be read; it

22  can be analyzed.  It was collected and provided to defense

23  today, and they can review exactly what the FBI collected.

24          Had it been encrypted, it would not have been of the

25  same value, because the encrypted data stream itself could

———— D. Alfin - Direct ————

1   not be read.  In order to read that encrypted data stream, it

2   would have to first be decrypted by the government, which

3   would fundamentally alter the data.  It would still be valid,

4   it still would have been accurate data; however, it would not

5   have been as forensically sound as being able to turn over

6   exactly what the government collected.

7   Q.  And on the question of chain of custody, that data stream

8   includes the unique identifier?

9   A.  Correct.  The chain of custody of the evidence is valid,

10  the digital chain of custody, as it's referred to.  Because

11  the data stream included a unique identifier, that unique

12  identifier was sent to Mr. Matish's computer over the

13  encrypted Tor network.  It came back with the NIT results.

14  It was not changed in transit, and it did, in fact, report

15  accurate data from Mr. Matish's computer.

16           And more important is the fact that the defense does

17  not have to take the government's word for it.  They have all

18  the tools that they need to recreate exactly what the

19  government used by using the NIT source code, comparing it to

20  the network packet capture, and comparing it to the data that

21  was provided in discovery.  The defense has everything they

22  need to recreate every step of this process to validate the

23  data that we have provided.

24  Q.  And when you say that the data was accurate, have you

25  reviewed information from the computer seized in this case

——————————— D. Alfin - Direct ———————————

1    and compared it to the NIT results?

2    A.   I have.   I have reviewed that data and confirmed that the

3    information that the NIT collected does in fact match

4    information from Mr. Matish's computer.

5         THE COURT:   How much longer do you expect your brief

6    evidence to take?

7         MS. GRATTON:   If I may just have five more minutes,

8    Your Honor.

9         THE COURT:   All right.

10   BY MS. GRATTON:

11   Q.   Have you reviewed the unique identifiers generated

12   through the operation of the NIT in all cases such as this?

13   A.   Yes, I've confirmed that every unique identifier that was

14   generated in this investigation was, in fact, unique.   There

15   were no duplicate identifiers generated.

16   Q.   Would a disclosure of -- well, have you reviewed the

17   charges pending in the superseding indictment in this case?

18   A.   I have.

19   Q.   Are any of them tied to child pornography found on

20   Mr. Matish's computer?

21   A.   No.   The charges in the matter at hand stem from the

22   activity of the Broden user account on the Playpen Web site,

23   which is corroborated by statements made by the defendant.

24   Q.   Are you aware of whether child pornography was, in fact,

25   found on any of these devices?

D. Alfin - Direct

1   A.  I have been informed that child pornography was found on

2   devices belonging to Mr. Matish.

3   Q.  Where?

4   A.  It was found in unallocated space on his computer, and

5   what that means is the images of child pornography were

6   placed on his computer at some point in time and then

7   deleted.  The FBI was able to recover them using forensic

8   software.

9   Q.  Would there be any information in files found in that

10  location regarding their source or when they were placed on

11  the computer?

12  A.  No.

13  Q.  Would any further disclosure of information related to

14  how the NIT was executed reveal where that information came

15  from?

16  A.  There is nothing else in the government's possession that

17  could shed light on where the images of child pornography on

18  Mr. Matish's computer came from.

19  Q.  Did the NIT have any other functionality beyond that

20  described in the warrant, such as turning on webcams?

21  A.  No.  The functionality of the NIT was described very

22  specifically in the NIT warrant.  It did not have any

23  functions outside of what was described in the NIT warrant.

24  It did not install any software, it could not remotely take

25  control of the computer, there was nothing left behind.  No

———— D. Alfin - Direct ————

1   settings on the computer were altered.

2   Q.  And could that be verified through a review of the NIT

3   code and the computer as you've testified and as described in

4   the declaration?

5   A.  Yes.

6   Q.  Have you performed such reviews in the past in other

7   cases?

8   A.  I have in other cases conducted analyses of computers

9   that were thought to be infected with either malware or

10  viruses or other software.  I have conducted that review on

11  my own.  I have been successful in finding such malware and

12  analyzing it.

13        Mr. Matish has everything available to him to

14  conduct such an analysis, should he decide to do so.

15  Q.  And the process for that is described in the declaration

16  you submitted to the Court?

17  A.  That's correct.

18  Q.  And, finally, would you describe the NIT as malware?

19  A.  No.  The declaration of Dr. Soghoian disputes my point

20  from my declaration that I do not believe the NIT should be

21  considered malware, but he fails to address the important

22  word that makes up malware, which is "malicious."

23        "Malicious" in criminal proceedings and in the legal

24  world has very direct implications, and a reasonable person

25  or society would not interpret the actions taken by a law

———— D. Alfin - Cross ————

1    enforcement officer pursuant to a court order to be

2    malicious.  And for that reason I do not believe that the NIT

3    utilized in this case pursuant to a court order should be

4    considered to be malware.

5    Q.  Would it have fundamentally altered the defendant's

6    computer?

7    A.  No, and the defendant has everything he needs available

8    to him to dispute that claim.  There's nothing to dispute,

9    but he can try to if he wants to.  He has his computer

10   available to him.  He also has the NIT available to him to

11   review.

12   Q.  Thank you.

13         MS. GRATTON:  Would you please answer any questions

14   that the defense or the Court may have.

15         MR. GRINDROD:  May I inquire, Your Honor?

16         THE COURT:  You may.

17                    CROSS-EXAMINATION

18   BY MR. GRINDROD:

19   Q.  Agent Alfin, I'm going to jump around a little bit.  I'll

20   try to let you know where I'm going.

21         So you started off talking about various items of

22   evidence that have been made available to the defense.

23   A.  Yes.

24   Q.  Now, you're aware that the defense requested all this

25   information about the NIT and the code and the computer

———— D. Alfin - Cross ————

1  programming back in March, right?

2  A.  I don't know the exact date, but I'm aware that these

3  requests have been made.

4  Q.  Okay.  And you talked about the fact that the government

5  made available the source code for the NIT, which has been

6  referred to also -- we refer to it as the payload.

7       Do you know what I'm talking about?

8  A.  The defense has.  You have referred to it in different

9  terms.  We have turned over what the government has defined

10 as the NIT in its entirety.

11 Q.  Okay.  And you're aware that the first time that the

12 government agreed to produce that particular data was in its

13 response to this motion to compel?

14 A.  I assume that's the case.  I don't know exactly what date

15 it was provided on, but I know it was turned over.

16 Q.  And then you talked about a data stream being made

17 available, right?

18 A.  Yes.

19 Q.  And you're aware that the first time that the government

20 agreed to produce that data was in its surreply to the motion

21 to compel.

22 A.  I don't recall the first time that that data was made

23 available, but I know it has been made available and has been

24 turned over.

25 Q.  As of --

──────── D. Alfin - Cross ────────

1    A.   As of today.

2    Q.   -- 20 minutes ago, correct?

3    A.   Yes.   To the best of my knowledge, it was not turned over

4    prior to that.

5    Q.   And you talked about access to Mr. Matish's computer

6    itself being, perhaps, a substitute for some of the other

7    data that the defense is requesting, right?

8    A.   Everything that the defense has requested can be verified

9    with the discovery that is available.

10   Q.   Now, the problem with that, right, is that a computer is

11   a malleable object, right, from a data perspective, right?

12   A.   Data on a computer can change.

13   Q.   And, so, there are a number of sophisticated forensic

14   techniques for recovering data from computers, right?

15   A.   There are.

16   Q.   But, at bottom, once a particular bit, once a particular

17   data point is written over, it's gone forever, right?

18   A.   After data has been overwritten it can be very difficult

19   or impossible to recover, yes.

20   Q.   Okay.   And so the NIT in this case, the exploit, was

21   deployed in February, right?

22   A.   I believe it was in February, yes.

23   Q.   And law enforcement did not actually go and seize

24   Mr. Matish's computer until much later that summer, and I

25   believe it was July, right?

———— D. Alfin - Cross ————

1   A.   I don't remember the exact date, but, that's correct, I

2   believe it was several months later.

3   Q.   So there's a significant time gap between when the

4   government ran its exploit, right, broke into Mr. Matish's

5   computer, and when it actually physically went and seized the

6   computer, right?

7   A.   There was a period of several months in between the NIT

8   identifying Mr. Matish and the search warrant that was

9   executed at his residence, yes.

10  Q.   Okay.  So if the government's use of the exploit made

11  Mr. Matish's computer vulnerable to some sort of other

12  malware attack -- right? -- then that evidence may have

13  existed on the computer at some point during that months-long

14  period but may not exist now, based on the computer as

15  recovered in July, right?

16  A.   The defense has said in its declaration that the NIT may

17  have made fundamental changes to Mr. Matish's computer;

18  however, the preview reports that I have read that are also

19  available to defense review show that the important

20  information on the computer remained the same between the

21  time that the NIT identified his computer and the time that

22  the search warrant was executed.

23          Additionally, it's my understanding the defense has

24  made no effort to actually analyze his computer to search for

25  any fundamental changes or any other alterations to the

——————— D. Alfin - Cross ———————

1   computer that are alleged.

2   Q.   Okay.  So my question was if there was some malware or

3   someone exploited the vulnerability created by the FBI in

4   February --

5   A.   The FBI did not create any vulnerability.

6   Q.   I want you to assume that they did for purposes of my

7   question, okay?

8   A.   They didn't.  I can't answer your question like that.

9   Q.   Well, you're testifying as an expert in this case,

10  correct?

11  A.   I don't believe I was qualified as an expert.

12  Q.   So none --

13  A.   I can --

14  Q.   None of the opinions, none of the testimony you're

15  offering in this case, is based on any sort of expertise?

16  A.   No, it certainly is.  I'm just -- for the record, I don't

17  believe I was officially qualified as an expert.  I know

18  different districts handle that differently.  I just want to

19  make sure I'm not misrepresenting my position.

20          THE COURT:  Well, I think when you file a

21  declaration in response to another person's expert

22  declaration that you're acting as an expert.

23          THE WITNESS:  Understood.  Different districts --

24          THE COURT:  So I think that Counsel can ask you a

25  hypothetical question which, if you are able to answer, you

———— D. Alfin - Cross ————

1    should answer.

2            THE WITNESS:  Understood, Your Honor.

3            THE COURT:  So go ahead with your question.

4            MR. GRINDROD:  Thank you, Your Honor.

5    BY MR. GRINDROD:

6    Q.  So I'm asking you for purposes of this question to assume

7    that the FBI did create some sort of vulnerability when it

8    deployed the exploit in this case on Mr. Matish's computer.

9    A.  Okay.

10   Q.  That would have taken place back in February, correct?

11   A.  Correct.

12   Q.  And if that vulnerability led to some other malware or

13   some other security breach in Mr. Matish's computer, the

14   evidence of that breach or of that other malware may have

15   existed on Mr. Matish's computer at some time between

16   February and July but may have disappeared by the time the

17   government seized that computer in July, right?

18   A.  In this theoretical situation that describes the events,

19   that did not happen.  Data could be deleted.  It's certainly

20   possible.

21   Q.  So the answer to my question is "yes," correct?

22   A.  The answer to your question is that data can be deleted.

23   Q.  And you would agree with me that when hackers or other

24   people use malware or try to surreptitiously get onto

25   someone's computer those programs are often designed in a way

——— D. Alfin - Cross ———

1   to try to actively cover up tracks, right?  They try not to

2   leave evidence behind of the fact that they were there,

3   right?

4   A.  Some malware is designed with those features, yes.

5   Q.  So...

6          MR. GRINDROD:  The Court's indulgence, Your Honor.

7          (There was a pause in the proceedings.)

8   BY MR. GRINDROD:

9   Q.  So let's talk about -- at various points in your direct

10  testimony you said that if you were the defense expert you

11  would do X, Y, or Z.  Do you remember those statements?

12  A.  Yes, I remember them.

13  Q.  And you also testified that in your capacity as, I guess,

14  a government expert in this case you have gone and looked at

15  the data, the evidence itself, and analyzed it and then made

16  some sort of conclusion or statement in your declarations or

17  in your testimony today, right?

18  A.  Yes, that's true.

19  Q.  And you mentioned at various times that if you were the

20  defense expert you would confirm that you would use the data

21  provided to confirm that the data did what the FBI says it

22  did, right?

23  A.  I said that I would use the evidence that the government

24  has provided in discovery to confirm that the evidence that

25  we collected and made available is an accurate representation

———— D. Alfin - Cross ————

1    of what the NIT actually sent from Mr. Matish's computer.

2    Q.  You testified on direct that the use of -- that the

3    analysis of the NIT would allow a defense expert to confirm

4    that it does exactly what the FBI says it does.

5        Do you remember that testimony?

6    A.  Yes.  That, combined with the other evidence available,

7    but, yes, I said that.

8    Q.  And what you're saying, right, is based on the data you

9    have provided, some data, that a defense expert,

10   technological expert, could look at the data to determine

11   whether, in fact, what the FBI says they did actually is what

12   they did, right?

13   A.  Yes, that's correct.

14   Q.  Okay.  And you would agree with me that that is a proper

15   role for a forensic expert.

16   A.  Yes.

17   Q.  Okay.  You would also agree with me that the government

18   has not produced some of the data, including the exploit, in

19   this case, correct?

20   A.  There was an exploit used in this case that has not been

21   turned over because it is immaterial.

22   Q.  And you agree that it is possible for an exploit to make

23   fundamental alterations to a computer system.

24   A.  Yes.  In my declaration I stated that an exploit -- not

25   the one used by the government -- could make alterations to a

D. Alfin - Cross

1  computer system; however, the one the government used did

2  not.

3  Q.  Okay.  So that part of your statement, the "however" --

4  right?  You say, "however."  An exploit can do this; however

5  yours didn't, right?

6  A.  Correct, and that can be confirmed by analyzing

7  Mr. Matish's computer, which is available to your defense to

8  review.

9  Q.  Well, except that my client's computer may not contain

10  that data.  You just testified it may have been overwritten,

11  right?

12  A.  It contains the same data that the NIT collected back in

13  February.  We've reviewed that report.

14  Q.  So you would agree with me that with respect to some of

15  the data you've agreed to produce you say a defense expert

16  should look at the data and, based on looking at the data,

17  they can confirm whether or not the technology actually did

18  what the FBI says it did, right?

19  A.  Yes, they should look at what we provided to confirm that

20  what we've provided does what we say it does.

21  Q.  And you would agree with me that the government, having

22  not produced the exploit -- the defense experts cannot look

23  at the exploit to see if the exploit did what you say it did,

24  right?

25  A.  The exploit, again, would shed no light on what the

─────────── D. Alfin - Cross ───────────

1   government did.  It would not --

2   Q.  Let me stop you there and ask a follow-up, if I can.

3   A.  Okay.

4   Q.  You say the exploit would shed no light on what the

5   government did.  The government deployed this exploit,

6   correct?

7   A.  The government used the exploit to deploy the NIT.

8   Q.  And I believe you used the analogy that this exploit is

9   like a way of picking a lock, right?

10  A.  Yes.  A more accurate analogy may be going in through an

11  open window.  As I've stated in my declaration, there was a

12  vulnerability on Mr. Matish's computer.  The FBI did not

13  create that vulnerability.  That vulnerability can be thought

14  of as an open window.  So we went in through that open

15  window, the NIT collected evidence, and then left.  We made

16  no change to the window.

17        Looking at that window, telling you what window it

18  was, you can look at the window all day long.  It gives you

19  no insight into what the FBI did or what evidence was seized.

20  In order to know that you have to analyze the NIT, which was

21  turned over in its entirety.

22  Q.  So let's not confuse analogies.  Let's go back to the one

23  you used in your declaration about picking the lock.

24  A.  Okay.

25  Q.  So you're telling us that you know exactly how the

Heidi L. Jeffreys, Official Court Reporter

─────────── D. Alfin - Cross ───────────

1    government picked the lock on the front door to Mr. Matish's

2    computer, right?

3    A.  I know information about how the FBI deployed the NIT.

4    Q.  And that's because you've seen the data that makes up the

5    exploit, right?

6    A.  No, I have not.

7    Q.  So you're offering sworn statements about what the

8    exploit did or didn't do.  What is the basis for your

9    testimony?

10   A.  I have executed the NIT, which included utilizing the

11   exploit on a computer under my control.  I confirmed that it

12   collected the information that it was authorized to collect,

13   and I confirmed that it did not make any fundamental changes

14   to my computer.

15   Q.  So you didn't even look at the actual code, at the actual

16   data, you just tried to observe the effects of executing the

17   code?

18   A.  I have not viewed the exploit myself, nor have I ever

19   claimed to or made any implication that I have.

20   Q.  Well, you make a number of explanations about what the

21   exploit is and what it does and doesn't do.

22   A.  Yes.

23   Q.  But it's your testimony today that you've never even

24   looked at this data that the defense is requesting.

25   A.  You can use a computer without knowing how to build a

——— D. Alfin - Redirect ———

1    computer and see what the computer does.

2         I never claimed to have looked at the exploit, nor

3    would there be any need to, because, again, as stated

4    previously, it is immaterial.

5         MR. GRINDROD:  No further questions, Your Honor.

6         MS. GRATTON:  If I may just briefly address a couple

7    of points, Your Honor, very briefly.

8                     REDIRECT EXAMINATION

9    BY MS. GRATTON:

10   Q.  The defense asked you about a hypothetical in which the

11   FBI created a vulnerability.  Is there a way to test whether

12   any such vulnerability was created?

13   A.  Yes.  If they want to see if there were any fundamental

14   changes or vulnerabilities on Mr. Matish's computer, they can

15   review Mr. Matish's computer, which they have declined to do

16   thus far.

17        Additionally, they can look at the NIT source code,

18   which we have provided in its entirety, and confirm that it

19   does not make any changes to the computer or open up

20   vulnerabilities.

21   Q.  And the information gathered by the NIT, to briefly

22   summarize, was the operating system, the host name, the user

23   name, the MAC address, the unique identifier, whether the NIT

24   had been deployed to it before, and then also the IP address

25   disclosed in the transmission of that information back to the

———— D. Alfin - Redirect ————

1    FBI?

2    A.   Whether or not the NIT had been deployed to the computer

3    previously was information tracked by the government.

4    Mr. Matish's computer would have no way of knowing that

5    itself, but, yes, those are the items listed from the warrant

6    attachment.

7    Q.   Are any of those items -- I believe you testified to the

8    MAC address.  Can that be changed?

9    A.   It can be --

10           MR. GRINDROD:  Objection, Your Honor.  This is all

11   outside the scope and asked and answered.

12           MS. GRATTON:  Your Honor, the defense is arguing

13   that some hypothetical attack on Mr. Matish's computer

14   through a hypothetical vulnerability resulted in significant

15   changes to his computer that may no longer exist, and, so,

16   I'm trying to determine whether the information at issue,

17   which are the items collected by the NIT, could have been

18   changed.

19           There's been testimony that they did not change, but

20   whether a MAC address or an operating system is subject to

21   complete hack and overwritten, that may have vanished in the

22   months between the execution of the NIT and the seizure of

23   the defendant's computer, as Counsel suggested on cross.

24           THE COURT:  Well, I think he's already answered that

25   question.

```
 1            MS. GRATTON:  Very well.
 2  BY MS. GRATTON:
 3  Q.  And although you've not reviewed the exploit source code,
 4  are you familiar with the operation of the NIT in this case?
 5  A.  I am.
 6  Q.  And you --
 7            MS. GRATTON:  No further questions.
 8            THE COURT:  All right.  You may step down.
 9            THE WITNESS:  Thank you, Your Honor.
10            THE COURT:  All right, Mr. Grindrod.  It's your
11  motion, so I'll hear first from you.
12            MR. GRINDROD:  Your Honor, I would first direct the
13  Court's attention to the decision in Michaud, which since the
14  last time we were here I've supplemented the record with the
15  order from that case that addressed the discoverability of
16  this same information and the transcript regarding the
17  same --
18            THE COURT:  You did, but it didn't really give any
19  reason for the opinion.
20            MR. GRINDROD:  Well, Your Honor --
21            THE COURT:  It just said he had studied it before
22  and mentioned a series of amendments and said, that's it.
23            MR. GRINDROD:  Well, Your Honor, I would just
24  note --
25            THE COURT:  So the decision is helpful, but the
```

Heidi L. Jeffreys, Official Court Reporter

1    rationale is absent.

2              MR. GRINDROD:  I understand the Court's position.

3          The Court in that case did rely on expert

4    declarations that were very similar to and in some cases

5    drafted by the same experts in this case, which I do think is

6    probative, but I understand the Court's position on that.

7          I would also note the government raises in its

8    surreply that there is some meaningful difference in the

9    circuit standard.  I think that's a bit of a red herring,

10   Your Honor.  Under either the Ninth Circuit standard or the

11   Fourth Circuit standard, which we agree is set out in *Caro*,

12   there is a strong indication that this evidence will play a

13   role in uncovering admissible evidence, aiding in witness

14   testimony, and corroboration and/or impeachment.

15         Your Honor, I'm going to use a couple of analogies,

16   because I think it's important not to get too lost in the

17   weeds of the technology here.  But I think it's appropriate

18   to view this code as analogous in some ways to a confidential

19   informant or the underlying DNA analysis that we see in maybe

20   a more common case.  And the fundamental disagreement between

21   the government and the defense in this case is whether the

22   defense is entitled to the evidence or, alternatively,

23   whether the defense is entitled to the government's

24   description of or assurances about what the evidence will

25   show.

```
 1              It's our position, Your Honor, that the government
 2      cannot simply say, we've reviewed the evidence, or, in the
 3      case of Agent Alfin, I haven't actually looked at the code
 4      that you want, but I can still tell you you don't need it.
 5              We've set out through our expert declarations
 6      exactly why this information is critical, and the government
 7      is saying, no, we've looked at it, we've analyzed it; our
 8      experts say you wouldn't be able to make a meaningful trial
 9      defense based on this information.  But in some ways, Your
10      Honor, that's the same as saying, we're not telling you who
11      our confidential informant is.  You don't need to talk to
12      him, because we're telling you he's believable and everything
13      he's saying is true.  You don't need to look at the DNA tests
14      from the lab, because we're telling you it's a match, and
15      we're telling you the tests were fine.
16              The government has the evidence --
17              THE COURT:  Well, now, among the things that were in
18      your expert declaration was that you could tell -- or you
19      wanted to examine the exploit to determine if the information
20      sent back from the defendant's computer to the government's
21      computer was compromised.
22              MR. GRINDROD:  That's one reason we need the
23      exploit.  That's one reason we need that.
24              THE COURT:  Now, what information do you have that
25      that information was compromised in transit?
```

 1          MR. GRINDROD:  Well, we know, Your Honor, that it

 2   was susceptible to being tampered with, and --

 3          THE COURT:  Why?  How do you know that?

 4          MR. GRINDROD:  Well, that's based on Agent Alfin's

 5   testimony at the suppression hearing.  We know that this

 6   information was not sent in encrypted form, and Dr. Soghoian

 7   sets out in his declaration that that's very important,

 8   because when information is sent through unencrypted channels

 9   it's particularly susceptible to being tampered with.  So

10   that's one reason, Your Honor.

11          But the other reason, Your Honor --

12          THE COURT:  Well, they also said that the best

13   practices required that it be encrypted.

14          MR. GRINDROD:  That's what our expert would say,

15   Your Honor, yes -- or has said.

16          THE COURT:  Why would that be the case?

17          MR. GRINDROD:  To prevent tampering with the

18   evidence.  I mean, this is analogous to -- I mean, there's a

19   crime scene.  Certain evidence is collected, and rather than

20   bagging and labeling it and following established techniques

21   for how evidence is to be collected and transferred back to,

22   you know, the server, which is like an evidence locker, they

23   just threw everything in the back seat of the cruiser and

24   drove back.  Oh, and, by the way, they won't tell us whether

25   on the way back they also picked up someone else who rode in

1     the back of the cruiser.

2              I mean, in some ways the government is right that by

3     maintaining a monopoly on the evidence, by keeping the

4     evidence secret from the defense, we can't, with absolute

5     certainty, say that the evidence was tampered with.  We can

6     just say that we know, based on Agent Alfin's declaration,

7     that it was susceptible to being tampered with and that the

8     evidence of the government --

9              THE COURT:  Well, your experts seemed to indicate

10    that they thought it could be tampered with as well.

11             MR. GRINDROD:  That's correct, Your Honor.

12             THE COURT:  And, therefore, it should have been

13    encrypted.

14             MR. GRINDROD:  That's correct, Your Honor.

15             THE COURT:  Because if you don't encrypt it, anybody

16    can tamper with it.

17             MR. GRINDROD:  I think that's correct, Your Honor.

18             And, also, I think the exploit is particularly

19    important here, Your Honor.  And the government concedes that

20    an exploit -- although, they don't say theirs did this --

21    that an exploit can create critical vulnerabilities, make

22    fundamental changes to a computer system.  And Agent Alfin

23    somehow, without having actually looked at the code, is able

24    to offer under-oath statements that their exploit did not do

25    those things.  But, again, this notion of unlocking --

1         THE COURT:  Your experts have not examined the

2    defendant's computer.

3         MR. GRINDROD:  That's correct, Your Honor.

4         THE COURT:  But the government has offered them the

5    opportunity to do that.

6         MR. GRINDROD:  That's correct, Your Honor, and we've

7    actually very recently had some conversations about getting a

8    forensic copy of the computer to better analyze the parts of

9    the code that the government has produced.  But we don't

10   agree that that's a substitute, I mean, for the very reasons

11   that Agent Alfin said on the stand; that there was --

12        THE COURT:  Well, if you examined the defendant's

13   computer and hypothesized there had been some malware

14   inserted on the computer in this gap period you're talking

15   about, maybe it would still be on there, and maybe your

16   experts could find it.

17        MR. GRINDROD:  That's true, maybe, but --

18        THE COURT:  Oh, well, "maybe's" are what we're

19   talking about here, because maybe there's malware on it, and

20   maybe they could have found it, if there was.  So it would

21   seem --

22        MR. GRINDROD:  But what's critical -- sorry, Your

23   Honor.

24        THE COURT:  Don't talk over me.

25        MR. GRINDROD:  Yes, Your Honor.

1          THE COURT:  It seems to me that by examining the

2     computer they would have had everything to gain and nothing

3     to lose.  They might have found something that would give

4     them a factual basis for saying that they need the source

5     code.  Maybe they would; maybe they wouldn't.  But if they

6     did, it would certainly strengthen their position in asking

7     for the code, wouldn't it?

8          MR. GRINDROD:  I think that's probably right, Your

9     Honor.

10          THE COURT:  All right.  Well, I don't understand why

11     they wouldn't have taken advantage of that opportunity before

12     today's hearing.

13          MR. GRINDROD:  Well, Your Honor, it's unlikely

14     that -- I mean, Agent Alfin touched on this, but, I mean, the

15     malware that would have taken advantage of the vulnerability

16     that may have been created by the government is, in all

17     likelihood, designed not to be found, and, so, the fact

18     that --

19          THE COURT:  I think what I'm saying is they had

20     everything to gain by examining the computer and nothing to

21     lose.  What could they have lost by examining it?

22          MR. GRINDROD:  Well, a lot of money.  But, I mean,

23     Your Honor, the fact of the matter is that --

24          THE COURT:  Well, you haven't asked for any money to

25     cover their cost of examining the computer, have you?

1              MR. GRINDROD:  No, Your Honor, but if the government

2    wants to pay for our expert to conduct a full forensic

3    analysis and then, if and when they don't find anything,

4    they'll agree to produce the exploit, then we would agree to

5    that process.  I mean, the fact that --

6              THE COURT:  Well, I don't understand why they

7    wouldn't do that, because they've got everything to gain and

8    nothing to lose by examining his computer.  I mean, they

9    might find -- they said, well, maybe there was another source

10   for the pornography other than directly from Playpen.

11             Well, if they examined the computer maybe they would

12   find some evidence that there was some other source.  Maybe

13   they would; maybe they wouldn't.  But, again, isn't it worth

14   a try?

15             MR. GRINDROD:  Well, perhaps it is, Your Honor.  I

16   would say that --

17             THE COURT:  And shouldn't they try before they come

18   here and ask for the source code?

19             MR. GRINDROD:  No, Your Honor, and let me explain.

20             THE COURT:  Why not?

21             MR. GRINDROD:  Well, because --

22             THE COURT:  Because then there might be some basis

23   in fact for them to believe that they might find something.

24             MR. GRINDROD:  Well, there is a basis in fact to

25   believe that --

Heidi L. Jeffreys, Official Court Reporter

```
 1              THE COURT:  No, I think at this point it's very
 2    speculative.
 3              MR. GRINDROD:  Well, if our experts analyzed the
 4    computer and they found nothing, then the exact points that
 5    they've made today are exactly the same.
 6              If they have the exploit, that also could help them
 7    look for --
 8              THE COURT:  Well, I mean, if they examined it and
 9    there was no evidence of anything on there in the way of
10    malware and there was no evidence that there was any breach
11    or change to the security apparatus on the computer, it would
12    weaken their case in asking for the source code, wouldn't it?
13              MR. GRINDROD:  No, Your Honor.
14              THE COURT:  It wouldn't?
15              MR. GRINDROD:  And that's the point I'm trying to
16    make.
17              So the absence of finding malware on the computer
18    itself is the expected outcome, even if there was malware on
19    the computer, and, so, what we need to do --
20              THE COURT:  Well, it sounds to me like, then, that
21    they're saying that there's not much probability that there's
22    anything on there.
23              MR. GRINDROD:  Again, I disagree with that
24    characterization, Your Honor.  I think that what they're
25    saying is that the --
```

1          THE COURT:  I think what they're saying is they want
2     to call it -- they want to call NIT malware.
3          MR. GRINDROD:  I don't think that matters at all,
4     Your Honor.
5          THE COURT:  Absolutely.  I one hundred percent agree
6     with you.  So why are they doing it?
7          MR. GRINDROD:  Well, I think the academics get
8     excited about it, Your Honor.  I think there's still a --
9          THE COURT:  I think the academics don't like what
10    the NIT does.
11          MR. GRINDROD:  They may or may not, but I think,
12    from the perspective of this case, whether you call it
13    malware or not is rhetorical, at best.  The fact is --
14          THE COURT:  I agree with you, but if that's the case
15    why have they spent so much time trying to say it's malware?
16    Because they try to say it's malware, and it seems like in
17    saying that they're implying that they don't think the
18    government should have this capability.
19          MR. GRINDROD:  I think that's a normative question
20    that the experts in this case don't have to reach.  Perhaps
21    Congress --
22          THE COURT:  Well, they seem to have been trying to
23    reach it whether they need to or not.
24          MR. GRINDROD:  I agree that there are probably some
25    definitional points in this case that are, perhaps,

```
 1    technically important, but for the Court's purposes in
 2    deciding this motion I don't think need to be resolved one
 3    way or the other.
 4           For example, whether we call this what the
 5    government is requesting, the full source code or the
 6    payload, or -- I mean, everybody now knows what we're talking
 7    about.
 8           THE COURT:  Exactly, and I don't think the labels --
 9    no, I agree with you on that.  I think labeling it is an
10    exercise in uselessness, but it's interesting that they spend
11    so much time trying to so label it.
12           MR. GRINDROD:  Well, I think, Your Honor, as long
13    as -- I mean, at some point the definitions are only
14    important for getting everybody on the same page.  And I
15    think, despite some initial confusion, everybody at least now
16    has a generalized understanding of what exactly it is the
17    defense wants, what the government won't produce.
18           And I would agree with the Court that, for today's
19    purposes, what we call it is probably less important.  But
20    the evidence is still critically important, and that's what
21    we're asking for, Your Honor, is that the government -- this
22    notion of picking the lock to the front door of Mr. Matish's
23    computer is, I think, one that Agent Alfin put forward and
24    one that is particularly well-suited to demonstrating why we
25    need this information.
```

```
 1            Agent Alfin suggests, without having looked at the

 2    data, that this particular exploit worked in a way where the

 3    lock was picked but then, after the FBI left the computer,

 4    the door was locked behind it; there was no vulnerability

 5    created.  But he agrees, and our experts have set forward a

 6    basis, that without looking at the code there's no way to

 7    know whether the door was locked after the FBI left or

 8    whether it was just left unlocked or that the front door was

 9    open so that anyone passing by could walk right in, and it

10    was obviously kind of advertising the software vulnerability.

11            But all of those things are questions that can only

12    be answered if we have the data, and the government not only

13    refuses to produce the data but refuses to put on any

14    evidence by anyone who has actually looked at the data.  I

15    mean, they initiated this prosecution based on this

16    technology, and now they're playing hide-the-ball.  And, Your

17    Honor, I mean, it goes to the fundamental fairness of the

18    prosecution.  If the government is going to initiate a

19    technology --

20            THE COURT:  Well, of course, the problem is that the

21    evidence indicates -- or one of the problems is that the

22    evidence indicates that the defendant entered the Playpen

23    site before the NIT was instituted.

24            MR. GRINDROD:  I think that's the government's

25    position, Your Honor.
```

1         THE COURT:  Yes, well, that's it, and I think the

2    defendant admitted that in a written statement which the

3    Court has ruled is admissible.  So what you're trying to do

4    is say, if we got the source code, we could prove that what

5    the defendant admitted to is wrong.

6         MR. GRINDROD:  What we're saying, Your Honor, is

7    that whatever evidence the government may have against our

8    client, he's entitled to a defense under the Constitution.

9    And the defense we propose to mount is one that is, in part,

10   at least, based on a technological defense to the

11   government's technological evidence.  And the only way we're

12   going to be able to mount that defense is to have an expert

13   to counter the inevitable government expert who is going to

14   talk about how reliable this NIT was and how it worked and

15   how it didn't make any fundamental changes to our client's

16   computer.  You know, how is Mr. Matish supposed to challenge

17   that evidence or test that evidence?  This is the adversarial

18   system in which --

19        THE COURT:  Step one should have been examining his

20   computer, as the government points out in its brief.

21        MR. GRINDROD:  Your Honor --

22        THE COURT:  And that's -- and I haven't heard any

23   reason why they didn't do that.  And the witnesses have

24   elected to testify by declaration so that they couldn't be

25   cross-examined, which is an interesting way of presenting

Heidi L. Jeffreys, Official Court Reporter

```
 1    their evidence, but that's the way you've chosen to present
 2    their evidence.  So these questions that the Court has,
 3    they're not here to answer them, so the Court has to draw
 4    inferences from what they've done and what they have failed
 5    to do.
 6            MR. GRINDROD:  Well, Your Honor, the experts have
 7    not conducted a forensic analysis of the computer because
 8    they haven't been directed to do so by counsel.
 9            THE COURT:  Well, it seems to me that they should
10    have directed counsel that that's what should have been done.
11    Counsel is not the expert on the computer.  Counsel shouldn't
12    have directed them to search the computer, they should have
13    directed counsel that the computer should have been searched.
14            MR. GRINDROD:  And, Your Honor, if that was the
15    appropriate step, then I believe they would have.  And that's
16    my point, Your Honor.  I mean, I get that there's some
17    rhetorical appeal to this notion of looking at the computer.
18            THE COURT:  Well, they didn't do it.
19            MR. GRINDROD:  Because --
20            THE COURT:  And what they failed to do speaks very
21    loudly.
22            MR. GRINDROD:  Well, Your Honor, again, I mean, I
23    think that's only -- that's only -- there's no -- if they
24    looked at the computer, no matter what they found, the answer
25    is we still need the exploit.
```

```
1              THE COURT:  If they looked at the computer, perhaps
2    there's evidence there indicating that what they say may have
3    happened is a bit more likely to have happened, if they
4    looked at the computer and found something to support their
5    hypotheses.  And I think it's a generous term to describe it
6    as a hypothesis.  It could just as well be described as
7    speculation.
8              And they could have -- the evidence is perhaps there
9    for them to have found some lead on the computer.  Experts
10   can do amazing things with computers.  I remember the case
11   where the man took the computer from his place of employment
12   and put something on there that was called Erase to erase all
13   his e-mails.  And then he took it to the junkyard and beat it
14   with a sledgehammer.  And then it was recovered, and they got
15   information off of the computer as to his e-mails.
16             Experts can get a lot off of computers, and I'm at a
17   total loss to understand why they didn't instruct you that
18   that should be done.
19             MR. GRINDROD:  Your Honor, I've raised that point
20   with Dr. Miller, specifically, and the answer is because it
21   doesn't move the ball forward.  I mean, we can spend a bunch
22   of money --
23             THE COURT:  Well, I think the answer may be that
24   Dr. Miller is more interested in getting the code than
25   getting the information.
```

1           MR. GRINDROD:  I don't know that there's any basis

2    for that, Your Honor.  I mean, he's subject to a protective

3    order.  It's not like he can publish based on any information

4    that he gained as a result of this.

5           THE COURT:  I think one of your experts has already

6    published based on information he gained from this sort of

7    situation, hasn't he?

8           MR. GRINDROD:  I'm not -- I'm not aware of that,

9    Your Honor.  I know Dr. Soghoian has not reviewed any

10   information that's subject to the protective order in this

11   case, so I don't believe he would be --

12          THE COURT:  Well, it's clear -- if nothing else is

13   clear, it's clear that the experts don't like the fact that

14   the government has this device at their disposal.  That's

15   absolutely clear.

16          MR. GRINDROD:  But these are accomplished academics,

17   Your Honor, from --

18          THE COURT:  They're hired experts.  And the fact

19   that you have two of them doesn't add to their credibility,

20   because, quite frankly, you could probably find any number of

21   them, if you wanted to, who would say the same thing.  It's

22   like Tweedledum and Tweedledee; oh, yes, I agree with

23   Dr. So-and-so's analysis.  Well, I didn't expect him to say

24   that he disagreed with it, because if he did I don't think I

25   would be looking at his declaration.

1          MR. GRINDROD:  The government's only expert in this

2     case is their case agent, who is running this whole

3     operation.  I mean, this is Agent Alfin's show, with hundreds

4     of prosecutions across the country.  I don't know that his --

5     I mean, the Court can evaluate the credibility of the various

6     experts, but the testimony of someone who is the lead case

7     agent --

8          THE COURT:  I mean, are you saying that an expert

9     who part of his job is being an expert and is not paid

10    anything extra is to be criticized for that, as opposed to

11    somebody who is hired to say something?

12         MR. GRINDROD:  Dr. Soghoian is doing this pro bono,

13    as he states in his declaration.

14         THE COURT:  Well, I guess Agent Alfin is doing it

15    pro bono, too, because he gets his regular salary.  He's not

16    getting paid extra for being an expert, is he?  You can ask

17    him that, if he's getting paid extra.  I guess your guy who

18    is doing it pro bono is getting a salary, isn't he?

19         MR. GRINDROD:  Your Honor, I'll leave it to the

20    Court to decide whether Agent Alfin has a stake in the

21    outcome or --

22         THE COURT:  Well, let's not -- okay.

23         MR. GRINDROD:  Thank you, Your Honor.

24         MS. GRATTON:  Thank you, Your Honor.

25         I think, as the Court has pointed out in questioning

1   the facts and whether we're dealing with facts or

2   speculation, really gets to the heart of the issue here,

3   which is whether the information sought is material, which is

4   the standard under Rule 16.  You know, if the inquiry is

5   whether it's material, if it's material, is it subject to

6   privilege, which the government has asserted, and, if so,

7   whether there's been a compelling need shown sufficient to

8   overcome that privilege.

9        But on the question of materiality, the defense has

10  cited a number of purposes for which he claims he needs the

11  information, including the full extent of the information

12  seized by the NIT, whether it interfered or compromised any

13  computer data functions, whether it was accurately described,

14  the chain of custody, and then the source of the child

15  pornography found on his computer.

16       THE COURT:  Well, it's his job to challenge

17  everything, isn't it?

18       MS. GRATTON:  Yes, of course.  I just -- in looking

19  at the reasons stated for disclosure of what is, essentially,

20  how the NIT got to his computer.  Because he has the computer

21  instructions that generated the results.  He was provided

22  today a copy of the data stream that shows exactly how those

23  results were transmitted back to the government.  And, as

24  Agent Alfin testified, he has, with that information, coupled

25  with the --

1          THE COURT:  Well, he doesn't want to believe what
2     they say.  Is he entitled to check his credibility by getting
3     the source code?
4          MS. GRATTON:  I think he first has to make a showing
5     of materiality, which requires under *Caro* that there must be
6     some indication that the pretrial disclosure would enable him
7     to significantly alter the quantum of proof in his favor.
8     And there has to be a threshold showing of the materiality of
9     the information there, one based on facts and not
10    speculation.
11         As the Court has noted, the defendant has not
12    examined his computers.  He's not pointed to anything in any
13    of the evidence that's been disclosed or made available
14    indicating that there's any sort of discrepancy or
15    irregularity in what the government has done, and --
16         THE COURT:  Does it make any difference that the
17    defendant said that he was responsible for the Broden posting
18    on Playpen prior to the NIT being deployed?  Does that make
19    any difference?
20         MS. GRATTON:  The government does believe that it
21    makes a significant difference, because --
22         THE COURT:  Well, it wouldn't make any difference if
23    the Court's ruling on this motion impacted the Court's ruling
24    on the invalidity of the NIT search, to begin with, because
25    then we wouldn't get to the confession, would we?

```
1              MS. GRATTON:  If the Court were to determine --
2              THE COURT:  Does the Court's ruling on this
3     discovery motion impact the Court's ruling on their first
4     motion to suppress?
5              MS. GRATTON:  Based on the fact that the defendant
6     has provided only speculation that the NIT did not operate in
7     the way that the government has said that it did, or that it
8     gathered or transmitted information beyond what's been
9     disclosed.  All of it, as outlined in the government's
10    response and surreply, is speculation.
11             There's been a significant amount of evidence on
12    this issue turned over to the defendant, and yet he doesn't
13    point to anything in the computer instructions saying that
14    those instructions would have done something other than
15    what's been represented, that they would have generated
16    results other than those disclosed, that they transmitted any
17    information, such as images or other content.
18             So the government's position is that --
19             THE COURT:  Well, the FBI could have just gotten
20    that second warrant to cover their tracks, couldn't they?
21    Maybe they got the images through the NIT but they realized
22    that that went beyond the search warrant, so they went and
23    got a second search warrant to cover their tracks.  They
24    could have done that, couldn't they?
25             MS. GRATTON:  Well, the response is twofold.  First,
```

1    there were no images transferred back to the FBI by --

2              THE COURT:  Well, I mean, that's what they say,

3    right.  I mean, does the defendant have to believe that?

4              MS. GRATTON:  No.  He has the data stream as it was

5    transmitted from his computer to the FBI.  He can look at

6    that to see if there was anything other than the NIT results

7    transmitted back to --

8              THE COURT:  Well, they're saying that if they had

9    the source code it may show that they got something else

10   other than --

11             MS. GRATTON:  The source code did not collect or

12   transmit information.  As Agent Alfin testified, it allowed

13   the FBI to enter an open window.

14             THE COURT:  The source code allowed them to enter

15   the open window, but it didn't play a part in the information

16   they gathered.  That's what they said.  How do they test the

17   accuracy of that information?

18             MS. GRATTON:  The computer instructions, if they

19   recreate those and execute them on the defendant's computer,

20   will generate the same results.  And they can test that.  If

21   they ask to review forensically the computer, they can

22   analyze it for the presence of any malware.  They can execute

23   a copy of the NIT that's been provided and determine if it

24   does anything other than it said it would do.

25             If the Court were to order, as the defendant

1    describes, the payloads, any and all payloads, delivered to

2    the defendant's computer as --

3         THE COURT:  Well, the difficulty in using language

4    like "payloads" is everybody uses a different description,

5    and it gets confusing to the Court reading all this --

6         MS. GRATTON:  If the Court were to order the

7    government to provide all the source code that gathered or

8    transmitted information from Mr. Matish's computer to the

9    government, I could stand here today and tell the Court that

10   the government has already provided that information.  So the

11   exploit at issue is not -- it didn't collect, it didn't

12   transmit information.

13        And the question about the child pornography found

14   on the computer, the FBI did get a second search warrant.

15   They got a search warrant for the residence that --

16        THE COURT:  Well, I know they did, but maybe they

17   did that just to cover their tracks, huh?

18        MS. GRATTON:  The defense can review the data stream

19   and see.  The only -- again, the Court could order us to

20   disclose the instructions that gathered or transmitted

21   information and all transmissions from the defendant's

22   computer, and we have disclosed those.  The defense can

23   review them and, if any such evidence exists, could highlight

24   that for the Court.

25        With respect to the computer instructions, Counsel

1    has had those for some time.  Admittedly, the network stream

2    was produced this morning.  There was -- between the two

3    hearings counsel for both sides were out and, at the earliest

4    time possible, discussed the production of the stream, and it

5    was brought here today in accordance with the agreement that

6    we reached.  But the defense can analyze that and determine

7    whether any images were sent back, whether the FBI was trying

8    to cover its tracks by finding the image through a forensic

9    examination of his computer after the search.

10         But I think the most important point about those

11   images and one that is, perhaps, not covered as it should

12   have been in the government's briefing is that, as testified

13   to here today, they were in unallocated space, they had been

14   deleted, and none of the charges against the defendant are

15   based on anything recovered from his computer.  The NIT was

16   used to identify and locate him, as the Court is well

17   familiar from its consideration of the first and third

18   motions to suppress.

19         The child pornography on the computer does not serve

20   as the basis for any charge, and the defense can look at the

21   information that was collected through the NIT at various

22   points, they can see the computer instructions, they can see

23   the network stream of the results and the results as

24   maintained and turned over by the government in a copy of the

25   user report and see that all of that is the same.  And not

1   only is that the same, but later reviews of the defendant's

2   computer identified the same information.  The preview done

3   at the time of the search shows the same operating system,

4   the same information, as does the later forensic report, to a

5   certain extent.  And the defense itself can go and review the

6   information, and if it's the same at every point there's no

7   reason to think that it was changed.

8          And, as Agent Alfin testified, the transition from

9   Mr. Matish's computer to the government included a unique

10  identifier that the FBI verified had not been changed.  And

11  he also testified about all of the things that would have to

12  occur for any kind of tampering with that transmission to

13  have taken place, including an extensive amount of knowledge

14  that would have had to have been available about the FBI's

15  investigation, both as to the FBI and the defendant, as well

16  as the ability to intercept and manipulate the transmission

17  in one second.

18         THE COURT:  Well, I'm sure that if they had

19  encrypted it and the encryption had to be translated by the

20  FBI they'd be complaining about the translation of the

21  encryption.  But that's his job, to complain about such

22  things.

23         MS. GRATTON:  And that would be the government's

24  view as well.  The defendant has a number of tools to

25  determine that the information gathered and used to identify

1    him is accurate.

2           And when considering whether further disclosure of

3    how the NIT got to him would significantly alter the quantum

4    of proof in his favor, the government does think the Court

5    can look to the confession, look to the full quantum of proof

6    of evidence available in this case to determine whether some

7    questioning as to how information was transmitted back

8    through the operation of the NIT would undermine the fact

9    that the defendant acknowledged that well before its

10   execution he was acting as Broden on the Playpen Web site.

11   So the government does think that that fact is significant

12   when determining whether the information sought here would

13   significantly alter the quantum of proof in the defendant's

14   favor.

15          With respect to the circuit law, I think a review of

16   the opinions relied on in the *Michaud* case makes clear that

17   the standard is different there.  In the *Munez* --

18          THE COURT:  Well, does that recent decision by the

19   Fourth Circuit on the question of the transmission tower

20   impact your argument on that point?

21          MS. GRATTON:  I don't believe so, Your Honor.  I

22   don't have that opinion immediately available in front of me;

23   however, I am aware that the en banc --

24          THE COURT:  Well, that opinion came out at the same

25   time as my opinion came out, so I didn't have the benefit of

1    it when I wrote my opinion.

2         MS. GRATTON:  But in that case the Court did

3    determine that in order to seek those orders, the orders at

4    issue in those cases for the cell tower information, that the

5    government was not required to obtain a warrant based on

6    probable cause.

7         Unfortunately, I don't have the opinion immediately

8    in front of me.  I'd be happy to submit any additional

9    briefing the Court would like on that question.

10        THE COURT:  I'm familiar with it.

11        MS. GRATTON:  But in the *Munez-Walkez* opinion out of

12   the Ninth Circuit -- or, excuse me, *Hernandez-Meza*, both of

13   which were cited by the Court in *Michaud* and appear to be the

14   standard on which the Court made its materiality finding,

15   describe materiality as a low threshold and said that

16   anything that would allow a defendant to completely abandon a

17   planned defense or take a different path is material.  Well,

18   when you compare that to the language in *Caro*, it says,

19   "Evidence is material if its disclosure would enable him to

20   significantly alter the quantum of proof in his favor."

21        So reading those two standards side by side, the

22   government does think that there is a material difference

23   there that would warrant a ruling that -- especially in light

24   of the failure to show any issues of irregularity here, in

25   light of the evidence that has been disclosed and, frankly,

1     the failure to even fully examine the evidence that is

2     available to him, that at this point the defendant has not

3     made a showing of materiality sufficient to order any further

4     disclosure of information related to the delivery of the NIT.

5          Additionally, the government has offered for the

6     Court's ex parte and in camera consideration a classified

7     briefing related to the question of privilege.  The general

8     outlines of the issues raised in that filing were included in

9     the sealed declaration attached as Exhibit 2 to the

10    government's surreply and made available to the defendant.

11         And it's the government's position, even if the

12    Court were to find that the defendant has made a threshold

13    showing of materiality, that the information is nonetheless

14    privileged.  And the question of disclosure is not resolved

15    simply by the finding of materiality in and of itself,

16    because we don't get to law enforcement privilege until we've

17    decided that the information is material and otherwise

18    subject to disclosure under Rule 16.

19         So if we're there, there has to be some showing

20    beyond that of a compelling need for the information that

21    outweighs the public's interest in keeping it private and

22    secret.

23         THE COURT:  Well, the entire case is about the

24    public's interest in being protected from child pornography,

25    on the one hand, as against the right of privacy implied by

1    the Fourth Amendment, on the other.

2         MS. GRATTON:  As the Court noted in its ruling on

3    the first and third motions to suppress, that is the balance

4    that must be struck here.  And at least with respect to the

5    suppression question, the Court found the balance struck in

6    favor of the public's interest.

7         So the government would ask the Court to consider

8    the information submitted for the ex parte and in camera

9    review.  Mr. Prabhu, my colleague, is here to address any

10   further questions in that setting, if the Court has them.

11        And so, even if the defendant has shown materiality,

12   he has not shown anything beyond that that would indicate a

13   compelling need for the information sufficient to overcome

14   the public's interest in keeping it secret, particularly in

15   light of the fact that we are dealing here with speculative

16   claims about what could have happened, what might have

17   happened, without any facts showing that any of that did

18   happen.  The government provided extensive discovery.  There

19   are additional steps that the defendant can take.

20        Thank you, Your Honor.

21        THE COURT:  Thank you.

22        MR. GRINDROD:  I'll be quick, Your Honor, if I may.

23        THE COURT:  You may.

24        MR. GRINDROD:  Your Honor, just to address two

25   points raised by the government, one, with respect to the

 1    showing of materiality, the *Caro* case, the Fourth Circuit

 2    case that the government cites, says that, "Evidence is

 3    material as long as there's strong indication that it will

 4    play an important role in uncovering admissible evidence,

 5    aiding in witness preparation, corroborating testimony, or

 6    assisting impeachment or rebuttal."

 7            Their argument against materiality is based solely

 8    on Agent Alfin's testimony in court and his declarations, but

 9    there's no way of either corroborating or impeaching that

10    testimony if we don't have the evidence upon which it's

11    based.  That's what we're asking for.

12            Number two, Your Honor, I know the Court addressed

13    various positions on materiality, and whoever has it may have

14    some bias in this case.  But I would note that on that

15    question had we not filed this motion, the government's

16    position in this litigation was that none of this information

17    was material and they were not going to produce any of it.

18    Now they're relying on this other information that they

19    subsequently produced to say that, this other information

20    that we want, that we asked for back in March, is not

21    material.

22            Well, if their first position was none of it's

23    material, and in their response to our motion they say, okay,

24    you can have this part of it, and then in their surreply they

25    say, okay, you can have this part, and now they're saying,

1     well, because we gave you this part, you don't need this

2     other part you want -- we need it, Your Honor.  We need the

3     evidence.  Mr. Matish has a constitutional right to putting

4     on a defense, and we need the evidence to do so.

5            Thank you.

6            THE COURT:  All right.  When the Court prepared its

7     opinion on the defendant's first and third motions to

8     suppress, the Court ordered that it be filed under seal.  At

9     the time I was preparing that opinion the trial was imminent

10    in the case, and I did not want the trial of the case to

11    become a media event, which I thought might affect the

12    Court's ability to give the defendant a fair trial.

13           Since then, the case has been certified as a complex

14    case and the case has been postponed.  The defendant didn't

15    ask that it be placed under seal; the Court made that

16    decision.  I don't know whether the defendant believes that

17    it should be continued under seal at this point in the

18    proceeding or not.

19           MR. GRINDROD:  Your Honor, that's something I've not

20    really discussed in depth with my client.  If it would please

21    the Court, if I could have a day or until later this

22    afternoon to notify the Court of our position on that --

23           THE COURT:  I don't know.  I mean, I -- you know,

24    sometimes when cases involve a difficult or controversial

25    issue, which this case certainly does, they change the case

1    to somebody against John Doe, or something like that, because

2    somebody doesn't want their name forever associated with a

3    case, regardless of the outcome, when it involves a sensitive

4    topic like child pornography.

5         So I don't know what to tell you about that.  All I

6    can say is if the defendant wants the opinion under seal,

7    I'll certainly consider that.

8         MR. GRINDROD:  I appreciate it, Your Honor.  I'll

9    make a filing of some sort one way or the other, if it

10   pleases the Court.

11        THE COURT:  But I need for you to do that quite

12   soon.

13        MR. GRINDROD:  Yes, Your Honor, understood.

14        THE COURT:  All right.  Well, having initially

15   placed its opinion under seal, and not having an answer as to

16   whether the defendant wants it to remain so, I will not go

17   into the Court's thinking at this time.  I'll prepare a

18   written opinion, which I would do anyway, but I'll hold off

19   on publishing any opinion until I hear from the defendant on

20   that issue.

21        Do you think you can let me know --

22        MR. GRINDROD:  This afternoon, Your Honor.

23        THE COURT:  Okay.  All right.

24        Is there anything further from either side, then?

25        MS. GRATTON:  No, Your Honor.

```
 1              MR. GRINDROD:  Nothing from the defense, Your Honor.

 2              THE COURT:  All right.  Are there any remaining

 3    pretrial motions pending, other than this discovery motion?

 4              MS. GRATTON:  No, Your Honor.

 5              THE COURT:  All right.  Well, I mean, some of the

 6    discovery has been handled by agreement between the parties,

 7    and the Court is really not privy to all that.

 8              MR. GRINDROD:  Correct, Your Honor.

 9              MS. GRATTON:  Yes, Your Honor.

10              THE COURT:  So as far as I know, this is the only

11    motion that the Court hasn't decided.

12              MR. GRINDROD:  I think that's right, Your Honor.

13              MS. GRATTON:  That's correct, Your Honor.

14              THE COURT:  All right.  Well, I'll wait to hear from

15    you, then, Mr. Grindrod.

16              I don't think it's necessary, regardless of the

17    Court's decision, to have an in camera hearing.  I've been

18    supplied with the government's brief that was marked

19    "Secret," which I have reviewed, and I think that the

20    materials that I reviewed in preparation for this hearing

21    would enable the Court to make a decision on whether the

22    privilege would apply if the Court finds the evidence

23    material without the necessity of an in camera hearing.

24              (The hearing adjourned at 1:35 p.m.)

25
```

Heidi L. Jeffreys, Official Court Reporter

1                            CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6                                /s

7                        Heidi L. Jeffreys

8

9                        June 16, 2016

10                              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Heidi L. Jeffreys, Official Court Reporter