**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>GERALD ANDREW DARBY )<br>)<br>Defendant. ) | CRIMINAL NO. 2:16cr36 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, by Dana J. Boente, United States Attorney, Elizabeth M. Yusi, Assistant United States Attorney, and Leslie Williams Fisher, United States Department of Justice trial attorney, offers this position paper regarding the sentencing factors stated in 18 U.S.C. §3553(a). The government has no objection to the content of the Presentence Investigation Report (PSR). According to the PSR, the correct advisory calculation under the United States Sentencing Guidelines (U.S.S.G. or "Guidelines") is 97 to 121 months' imprisonment. Based on the nature of the offense, the defendant's characteristics and history involving child pornography, the United States asks the Court to impose a significant sentence of imprisonment and supervised release. In support of its position, the government states as follows:

**I. BACKGROUND**

On September 8, 2016, defendant GERALD ANDREW DARBY ("the defendant") pleaded guilty to one count of Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). The Court is scheduled to sentence the defendant on December 15, 2016.

From in or about August 2014 through in or about March 2015, a hidden site named "Playpen" dedicated to the sharing of images of minors engaging in sexually explicit conduct

(SEC) operated on the anonymous TOR network accessible through the Internet. During the period in which it operated, the Playpen grew to be the largest known hidden site dedicated to the sharing of images of minors engaging in SEC operating on the TOR network worldwide.

Playpen's content was accessible only to individuals who knew of the site and its location and who created membership accounts. Playpen's registration process included content about the information required to create an account, including an instruction not to use a legitimate email address or to disclose any identifying information, as well as other recommendations on how to hide a user's identity. The board's content was categorized in sections, forums, and sub-forums. Within these were various "topics" authored by site members to which other members could reply. When accessed, the topic's original post appeared at the top of the page, with any corresponding replies included below it in a "thread" form. These topics included text, images, thumbnail previews of images, compressed files, and links to external websites. Certain topics contained information about how to use the site. However, the majority contained discussions about and numerous images that appeared to depict images of minors engaging in SEC and child erotica involving children of various ages, including prepubescent girls, boys, and toddlers. The sections, forums, and sub-forums containing these threads were organized by gender, age, and type of sexual activity.

In early 2015, the Federal Bureau of Investigation (FBI) determined the location at which Playpen was hosted. On February 20, 2015, FBI agents sought and obtained lawful court authorizations from the United States District Court for the Eastern District of Virginia, Alexandria Division, to (1) monitor the communications of Playpen's members and (2) deploy a

law enforcement technique on the site to identify registered members through their actual IP addresses and other information associated with the computers they used to access Playpen.

On February 22, 2015, the law enforcement technique was lawfully deployed pursuant to such authorization against Playpen member "NeoUmbrella." Among the information obtained through the deployment of this technique were the member's true IP address, the host computer name, "GLADOS," and the logon name, "Kasalari." The IP address associated with the "NeoUmbrella" account returned to a location in Suffolk, Virginia. That IP address belonged to the defendant. According to data obtained from Playpen's logs, the "NeoUmbrella" membership was created on December 25, 2014. Between December 25, 2014 and March 2, 2015, "NeoUmbrella" was actively logged in to Playpen for a total of 3 hours and 47 minutes. "NeoUmbrella" accessed topics that included links and preview images of material depicting images of minors engaging in SEC. "NeoUmbrella" did not create or respond to any topics, did not engage in private messaging with other members, and did not upload any content, including any images or videos, to Playpen. During the period in which "NeoUmbrella" accessed Playpen, the defendant resided at his residence located in Suffolk, Virginia.

On January 4, 2016, the FBI obtained a federal search warrant for the defendant's residence. On January 7, 2016, agents and Task Force Agents ("TFAs") with the FBI, along with other law enforcement agents, conducted a search of the defendant's residence pursuant to the lawfully obtained search warrant and seized several computers and other electronic media storage items. During the January 7, 2016 search, law enforcement agents spoke with DARBY at his residence. DARBY was advised that a federal search warrant was being executed at his residence. He was further advised that he was not under arrest, that he did not have to talk to the

interviewing agents, and that he was free to leave the residence at any time during the execution of the search warrant. Following these advisements, the defendant agreed to speak with the agents.

DARBY told the interviewing agents, in sum and substance, that he had been accessing images of minors engaging in SEC on the Dark Net approximately twice a month and he had been collecting these images for the past three to four years. He downloaded images of minors engaging in SEC to his computers and to his external hard drive. He stated he never distributed these images or commented on them online.

On or about February 2, 2016, a Department of Justice Forensic Examiner completed a forensic analysis on the electronic media seized from DARBY's residence, including an Asus Laptop which contained a Samsung hard drive therein, a second ASUS laptop computer with both a Samsung and HGST hard drive contained therein, and a Seagate USB external hard disk drive. Located on these electronic media were approximately 1,608 images and 298 videos of images of minors engaging in SEC. These images and videos contained depictions of minors being sadistically and masochistically abused.

The National Center for Missing and Exploited Children (NCMEC) maintains a database of child pornography images and corresponding child victims who have been previously identified by law enforcement. Each set of images with known victims is designated as a series. The images found on the defendant's phone were sent to NCMEC. Thereafter, NCMEC provided a report indicating that the defendant's computer media contained approximately 18 images and 83 video and 288 image files from 93 different known series of child pornography.

Some of those known victims have provided impact statements, which were provided to the Court through the U.S. Probation Office.

## II. STANDARDS GOVERNING SENTENCING

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. *Id.* at 264. The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 552 U.S. 85 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Id.* at 90. Finally, in *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the Sentencing Guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id.* at 49-50. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*,

269 Fed. Appx. 272 at *1 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

### III. THE GUIDELINES

In his position paper, the defendant discusses his concerns about the current state of the Guidelines dealing with child pornography. Admittedly, there are issues with the child pornography Guidelines, as discussed in the February 2013 Report to Congress by the United States Sentencing Commission. *See* U.S. Sentencing Commission: Federal Child Pornography Offenses (2013). The Sentencing Commission's report came out February 27, 2013 (the Report). The Commission has made some amendments, which were effective November 1, 2016, but has left the majority of the Section 2G2.2 Guideline intact. Regardless, the Guidelines are still the correct place to start in determining an appropriate sentence for the defendant.

The government would also like to point out the fact that the defendant did not receive all of the "typical" Guidelines enhancements, thus making his Guidelines range even more reasonable.

### IV. FACTORS UNDER 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), when imposing a sentence, the Court should consider (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to promote the goals of sentencing, (4) the kinds of sentences available, (5) the sentencing guideline range, (6) any pertinent policy statement issued by the Sentencing Commission, (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (8) the need to provide restitution to any victims of the offense.

### A. Nature and Circumstances of the Offense and Defendant's History and Characteristics

The nature of the charge to which the defendant has pleaded guilty, receipt of images of minors engaging in sexually explicit conduct, in and of itself calls for a substantial term of imprisonment. This is not a victimless crime. The victims are and continue to be the children depicted in the images. The "use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child" used in the production of the pornographic material. *Osborne v. Ohio*, 495 U.S. 103, 109 (1990). Furthermore, collecting child pornography images feeds a market that preys upon other children by creating a demand for more of the images. *Osborne v. Ohio*, 495 U.S. 103, 109-11 (1990).

The nature of the images and videos that the defendant had on his electronic media is extremely disturbing. The forensic examination of the defendant's electronic media revealed over 1,500 images of child pornography, including images that depicted bondage. These include images such as an image of an adult male inserting his penis into the mouth of a prepubescent female, whose wrists are bound, a nude prepubescent female who is bound and tied to a wall, and an adult male inserting his penis into the vagina of a prepubescent female. Additionally, the defendant had nearly 300 videos of child pornography, including videos that include bondage and bestiality. These videos include a video that depicts an adult male forcing his finger and then an object into the anus of a prepubescent female, while the minor victim repeatedly states that it hurts, and a video a prepubescent minor performing oral sex on an adult male. The Court should take these aspects of the defendant's crime and characteristics into consideration when deciding what a reasonable sentence should be for the defendant.

Recent research published in the Journal of Sexual Aggression discussed in detail the dangerousness and risk associated with those that collect child pornography.

> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., "hands-on" abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of "crossover" between child pornography collection and hands-on abuse is low (Eke & Seto, 2011; Endrass *et al*., 2009; Seto, Hanson, & Babchishin, 2011).
>
> The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant "crossover" may exist between these crimes.
>
> Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of "online" and "offline" offenders, most is limited by an important assumption; that is, an individual is a hands-off offender simply because official records do not reflect contact sexual offending. This assumption appears unwise, given the base rates for detecting sexual abuse are extraordinarily low, the finding that most victims of abuse never report their victimization to law enforcement, and the low percentage of arrests leading to convictions (Centres for Disease Control and Prevention, 2010; National Centre for Policy Analysis, 1999; US Department of Justice, 2010, 2012). Researchers should never assume an offender has not committed a hands-on crime merely because his or her criminal record does not reflect such a charge or conviction.
>
> In an interesting study by Buschman et al. (2010), which unfortunately has a small sample size, data were collected from Dutch offenders who had downloaded child pornography. The researchers were able to ensure that disclosures would not be used against the offenders in court-immunity that obviously facilitated more complete honesty. Self-report and post-polygraph confessions were compared, and researchers found that while the majority of participants (21 of 25) initially denied any high-risk behaviours towards children in their self-report,

8

>following polygraph examination many offenders admitted they had engaged in such acts, and five participants acknowledged they had a plan to sexually abuse children if the opportunity arose.[1]

This study goes on to describe its own processes as well as results. The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[2] These individuals had no known history of hands-on offending.[3] Six individuals (4.7%) admitted to sexually abusing at least one child *prior* to the polygraph.[4] However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated. That means a total of 57.7% of the sample admitting to *previously undetected hands-on sexual offenses*.[5] For children and judges, that is worse odds than a coin-toss. Even more shocking is the total number of hands-on victims for these 73 individuals: 282 children, nearly four per offender.[6]

This study is important because it supports the results of prior studies, i.e., that child pornography offenders have high rates (as high as 85%) of previously unreported sexual offenses

---

[1] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6. For the Court's convenience, this study has been attached as Exhibit 1.

[2] *Id*. at 8.

[3] *Id*.

[4] *Id*.

[5] *Id*.

[6] *Id*. at 9, Table I.

against children.[7] This should come as little surprise, as other studies that relied solely upon prior official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[8] A defendant's argument that less dangerous people commit Internet child pornography offenses flies in the face of the empirical science.

As an additional indicator of the dangerousness of these offenders, there is the very real effect that consumers, like DARBY, have had on the producers of child pornography.[9] "[I]n recent years there has been an increase in the frequency with which particularly violent images

---

[7] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 J. FAM. VIOLENCE 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet finding that "self reports" of the offenders in therapy revealed that **85% had committed prior "hands on" sex offenses**)(emphasis added); *see also* United States Sentencing Commission "Report to Congress: Federal Child Pornography Offenses," (2012) Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of **55 percent**.").

[8] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 SEXUAL ABUSE 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in THE SEX OFFENDER: CURRENT TRENDS IN POLICY & TREATMENT PRACTICE Vol. VII (Barbara K. Schwartz ed., 2012) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

[9] *United States v. Regan*, 627 F.3d 1348, 1355 (10th Cir. 2010) (affirming guideline sentence) ("Because child pornography promotes the victimization of children, individuals like Regan create a demand for its further production and abuse of children, even if their conduct is purely voyeuristic. Moreover, the volume of images in Regan's possession, including the images which conformed to the Guideline definition of sadistic or masochistic conduct, increased the seriousness of his offense).

and images of younger children are found in offender collections."[10] DARBY's collection was no exception, as it included bondage and prepubescent children. PSR, ¶¶ 11-12.

This trend towards violence is driven by consumers like DARBY. This is reflected in the prevalence of the 2G2.2(b)(4) violence and sadism Special Offense Characteristic (SOC) appearing in a high number of cases. However, the prevalence of that SOC should not be met with "It appears so frequently, I should ignore it." Indeed, quite the opposite response should occur. As has been said by another district court, "There can be no keener revelation of a society's soul than the way in which it treats its children…Given the recent statistics surrounding child pornography, we are living in a country that is losing its soul." *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010).

The United States does not ask the Court to use the Bourke study, or any of the studies discussed, as proof of uncharged crimes. However, the United States asks the Court to find that these studies highlight the seriousness of the offense. These studies, along with DARBY's own admissions, indicate a lengthy and substantial sentence for the defendant is appropriate given the dangerousness of the offense and the defendant.

### B.    Defendant's Criminal History

The defendant has no relevant criminal history. However, as this Court knows, this is not unusual in child pornography cases and should not be given much weight in the Court's determination of a sentence. And while the defendant has no prior criminal convictions, it

---

[10] United States Sentencing Commission "Report to Congress: Federal Child Pornography Offenses," (2012), Ch. 4, p. 85. Available online at: http://www.ussc.gov/news/congressional- testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses

should be noted that in his statement to the FBI, the defendant admitted that he has been viewing child pornography for the past three to four years.

### C. Need to Deter Future Criminal Conduct and to Protect the Public

The defendant's sentence needs to accomplish the twin goals of deterring the defendant from engaging in future criminal conduct and to protect the public. The government avers that, if given the opportunity, the likelihood that the defendant will return to this predatory behavior in the future is strong due to his obvious sexual attraction to minors. As such, the Court must fashion a sentence that will help BARNES and others hesitate, at least, before engaging in criminal conduct online. A lengthy sentence of imprisonment would assist in this specific and general deterrence.

### D. Need to Provide Treatment to Defendant

Due to the nature of the defendant's crimes, the defendant should be ordered to participate in a sex offender treatment program while incarcerated.

### E. Need to Avoid Unwarranted Sentencing Disparities

The defendant's crimes, history and characteristics, along with his actions related to the crimes of conviction, all support a significant sentence of imprisonment. As such, the need to avoid unwarranted sentence disparities clearly weighs in favor of a lengthy and substantial sentence. 18 U.S.C. § 3553(a)(6).

## V. CONCLUSION

The government agrees that the Guidelines calculations in the Presentence Report are correct. For the reasons stated above, the government asks the Court to impose a significant sentence of imprisonment and supervised release.

                              DANA J. BOENTE
                              UNITED STATES ATTORNEY

By:    <u>/s/ Elizabeth M. Yusi</u>
        Elizabeth M. Yusi
        Assistant United States Attorney
        Attorney for the United States
        United States Attorney's Office
        101 West Main Street, Suite 8000
        Norfolk, VA 23510
        Office Number: 757-441-6331
        Facsimile Number: 757-441-6689
        E-Mail Address: elizabeth.yusi@usdoj.gov

        <u>/s/ Leslie Williams Fisher</u>
        Leslie Williams Fisher
        Special Assistant United States Attorney
        Eastern District of Virginia
        101 W. Main St., Suite 8000
        Norfolk, Virginia 23510
        Phone: (202) 616-2557
        Fax: (202) 514-1793
        Email: Leslie.Fisher2@usdoj.gov
        Virginia Bar No. 77470

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of December, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Rodolfo Cejas, Esq.

I FURTHER CERTIFY that on this 9th day of December, 2016, I caused a true and correct copy of the foregoing Position of the Government with Respect to Sentencing Factors to be e-mailed to the following:

Tara R. Gill
U.S. Probation Officer
d

/s/ Elizabeth M. Yusi
Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address: elizabeth.yusi@usdoj.gov